## Augustus Pond v. The People.

The law does not require the necessity for taking human life to be one arising out of actual and imminent danger, in order to excuse the slayer; but he may act upon a belief, arising from appearances which give him reasonable cause for it that the danger is actual and imminent, although he may turn out to be mistaken. The guilt of the accused must depend upon the circumstances as they appear to him, and he will not be held responsible for a knowledge of the facts, unless his ignorance arises from fault or negligence.

Homicide *se defendendo*, in resisting an assault not made with felonious intent, is excusable where the danger to be resisted is to life, or of serious bodily harm of a permanent character, and unavoidable by other means in the power of the slayer so far as he is able to judge at the time. But he is bound if possible to get out of his adversary's way, and has no right to stand up and resist if he, can safely retreat or escape.

A man assaulted in his dwelling is not obliged to retreat, but may use such means as are absolutely necessary to repel the assailant from his house, or prevent his forcible entry, even to the taking of life. And, if the assault or breaking is felonious, the homicide becomes, at common law, justifiable, and not merely excusable.

The same circumstances which excuse or justify homicide in defense of one's self, will excuse or justify it in defense of his servant.

Whenever a forcible felony is attempted against person or property, the person resisting the attempt is not obliged to retreat, but may pursue his adversary if necessary, till he finds himself out of danger. But he may not properly take life if the evil may be prevented by other means within his power.

It is immaterial to the justification of homicide in resisting a forcible felony, whether the act was a felony at the common law, or made such by statute.

POND v. THE PEOPLE.

Private persons may forcibly interfere to suppress a riot or resist rioters; and they may justify homicide in so doing, if they cannot otherwise suppress them, or defend themselves, their families or their property.

A building thirty - six feet distant from a man's house, used for preserving the nets employed in the owner's ordinary occupation of a fisherman, and also as a permanent dormitory for his servants, is in law a part of his dwelling, though not included with the house by a fence. A fence is not necessary to include buildings within the curtilage if within a space no larger than that usually occupied for the purposes of the dwelling and customary outbuildings.

The Supreme Court can not, on reversing a judgment on exceptions, proceed to give such judgment as the facts set forth in the bill of exceptions would warrant. The court can only consider those facts as they bear upon the rulings of the court below ; and order a new trial if the exceptions are sustained.

*Heard April 24th, 25th, and 26th. Decided May 12th.*

Error to the District Court of the Upper Peninsula, for the county of Mackinac.

The plaintiff in error was tried on an information for the murder of one Isaac Blanchard, and convicted of manslaughter.

Upon the trial, as appears from the bill of exceptions, the following facts were proved: The homicide was committed on the 18th day of June, 1859, at Seul Choix, a point of land in Delta county, which is attached to Mackinac county for judicial purposes, extending about a mile into lake Michigan, and situate near its northern extremity about seventy-five miles from Mackinac. It was inhabited by a considerable population, who were here engaged in the business of fishing. Their houses and other buildings stood in a line near to and following the shore of the lake. Amongst these were the house and premises of the prisoner, where he was carrying on the business of fishing, and was living with his wife and three young children, one of whom was a young infant, and the eldest a daughter 12 years old, together with two hired men, named Daniel Whitney and Dennis Cull. It was a long building about 16 feet square, contained but one room, and had a bark-roof, and only one window, and but one door, made of boards, which was fastened to the building with leather hinges, and opened outward; and upon the

inside was fastened and kept closed by means·of a rope attached to it and a pin near the side of the door, around which the rope was drawn and made fast.

Thirty-six feet distant from the prisoner's house, was another building ·of the prisoner, called a net-house. This was constructed with six posts set in the ground, having plates upon their top, and the whole was enclosed with boards an inch or an inch and a quarter thick, nailed on the sides to the posts, and on the roof nailed to the plates, and to a ridge-pole. The joints of the roof were also covered with bark, and the bark held in its place by poles extending from one end to the other. It had a board floor, and but one door, which opened directly opposite to the door of the prisoner's house. This door was made of boards, was fastened to the building with leather hinges, and upon the inside was closed and fastened by the same means and arrangement as the door of the prisoner's house above described. It also had a latch. The net-house was about sixteen feet long and fourteen feet wide; contained but one room, had a berth constructed about two and a half feet high, for the purposes of a bedstead, in the end of the building opposite that containing the door, which berth was large enough to accommodate two persons comfortably, and on which the prisoner's two hired men, Whitney and Cull, had slept regularly, up to the time of the homicide, during their employment with the prisoner, the former having been ·in his service two weeks, and the latter one week immediately preceding. They took their regular meals with the prisoner's family in his house, and lived, as members of his family. Two of the three persons engaged in the transactions leading to and immediately connected with the homicide, David Plant and Isaac Blanchard, Jr., the deceased, resided also at Seul Choix Point, near its foot, at a place called the Harbor, Plant about a mile, and Blanchard about three-fourths of a mile from the prisoner's house. The other,

Joseph Robilliard, resided near the end of the point, and not far from the prisoner's premises.

On Thursday, at about noon, of the same week when the homicide occurred, Plant in the presence of said Blanchard, at the house of one Downey, situate on the point, threatened in conversation with Mrs. Downey, that. he must whip the prisoner or there would be a fracas. This threat was heard by the young daughter of the prisoner, who happened to be passing near at the time, and who immediately went home and communicated the threat to her mother, who thereupon immediately awakened the prisoner, he being then asleep on a bed, and communicated the threat to him in these words: "My little girl says in passing Mr. Downey's, she heard Plant say he was going to whip you." This was about 1 o'clock P. M. On the evening of the same day, at about 8 o'clock, an assembling of from fifteen to twenty persons occurred on the point, a few rods from the prisoner's house, and between the houses of Joseph Martell and a Mr. Durocher, which were about one hundred feet apart. The larger part of these persons resided at the harbor, and between the harbor and the point. They had, as Mary Pond, a witness for the prisoner, testified, been hunting for the prisoner, and had overtaken him near Durocher's house. Jerry Williams, a witness for the People, testified that he was one of the company; that he had been on board a vessel in the bay, and was returning towards the harbor; that he came there with a party of persons, and there met another party, and he could not say how many persons were present, nor how long they remained there.

In the company were Plant, Robilliard and the deceased. The prisoner was got into the company by Plant, who had called him out of Joseph Martell's house. They were sitting all around the prisoner, engaged in conversation. They surrounded him. Their proceedings thus far were observed by the prisoner's daughter, who was secreted behind Du-

rocher's house, in order to look at them and see what they would do to her father, and she then left, and went home and reported them to her mother. Whilst the company was so assembled, Plant told the prisoner that he did not use his neighbors right; that he ought not to pitch on to men not of his size and abuse them; that if the prisoner wanted to fight anybody, he had better take a man of his size. There was no evidence of any provocation on the part of Pond by words or acts. Plant then struck the prisoner in his face with his fist — the prisoner's hat at the same time falling off — and then kicked him in his breast. The prisoner did nothing more than pick up his hat and put it on again. Then they drank whisky together, furnished by Blanchard. In a short time the prisoner, as Mary Pond expressed it, "got clear of the company." At first, as stated by other witnesses, he walked off, and then was seen running away alone into the woods. About 9 or 10 o'clock on the same evening, Plant, Robilliard and Blanchard, came to the door of the prisoner's net-house. The prisoner's two hired men, Whitney and Cull, were then asleep therein, and when they went to bed that evening, the door was fastened to the building upon its hinges, and it was closed and fastened as usual on the inside by means of the rope above described, which was made fast around a pin or nail near the side of the door.

Whitney was awakened by the walking of Plant on the floor, and he then saw the door lying outside on the ground, torn from its hinges, and the pin or nail that had held the rope was also broken. Plant first went up to the bed, took hold of Whitney's arm and asked who he was. Whitney told him, and then Plant said "you are not the man." Plant then asked where the prisoner was. Whitney replied "at Joseph Martell's." Robilliard and Blanchard remained outside near the door of the net-house. This was after dark. Plant did not explain to Whitney

what he wanted of the prisoner. They then went to the door of the prisoner's house; Plant opened it. They wanted the prisoner; Plant asked where he was; his wife replied "I do not know; go and see on board the little vessel." Plant said, "we have been there, and he was not there; we must have him absolutely; we have got business with him." She replied, "What business have you? it is just as well to say it to me as to him: what do you want to do with him? Say it to me and I will tell him." They said "No, we must have him to-night: we do not wish to tell you; we will tell him:" and they then went away towards the point to hunt for him. When they came to the door there were about twenty persons behind the house.

Just after this occurrence the prisoner came home, stayed from five to ten minutes, went away, and slept all night at the house of a near neighbor, Joseph Martell. Between ten and eleven o'clock the same evening, Plant, Robilliard and the deceased, went to the house of Thomas Ward, after he had gone to bed, but for what purpose, was not shown.

On the next day, Friday, the prisoner was away from home most of the day, and Whitney saw him but once or twice. He came to the house of Joseph Martell on that day, between ten and eleven o'clock in the forenoon, to get his pistol, saying he wanted it for his hired man. He obtained it, carried it away, but it was not loaded and had no lock.

On the same day, about noon, Plant and the deceased were in company near the house of Peter Closs; the prisoner was also present, and then the deceased was standing about one hundred feet off. Plant was heard to make threats against the prisoner. Plant said to the prisoner, "It is a good while since you have had a grudge against me; I must whip you to satisfy myself." Plant went near to the prisoner and told him not to say anything; if he

did he would give him slaps, or kicks. Plant then took a stone in his hand, and said, "Don't speak any more; I am a good Irishman, and will throw it at you." · Pond did not say the least thing in reply to the threats, nor do anything; but went off quietly home. Immediately afterwards Plant went to the dock of Peter Closs, and there said, that he must whip Augustus Pond, or pass for the biggest loafer on the earth.

On the same day, about two o'clock in the afternoon, Plant and the prisoner were together at prisoner's premises, when the prisoner took Plant into the net-house, where they drank together once. They were there about ten minutes.

On Friday night, Plant did not go to bed. Plant, Robilliard and the deceased, were aboard some vessels near the shore from nine till about eleven o'clock in the evening, when they left the vessel. It was a bright moonlight night: the moon on this night was nearly full, and rose at ten o'clock and eleven minutes in the evening. Whitney and Cull went to bed in the prisoner's net-house, at about eleven o'clock in the evening. Before going to bed they set up the door in its usual place, and they soon went to sleep. None of the family in the prisoner's house went to bed this night, because they were afraid of Plant, Robilliard and the deceased.

Between one and two o'clock that night, Whitney was waked by boards being torn from the roof of the net-house, directly over his bed. Cull did not awake. Plant came inside and said, "some one is tearing down the net-house; let us go out and give 'em hell." At this time the west side and a part of the roof of the net-house were torn down by Robilliard and the deceased, who were outside, whilst Plant was inside the building. The whole three, Plant, Robilliard and the deceased, then went to the door of the prisoner's house, and as to what there transpired at the door, the prisoner's daughter, Mary Pond, testified as follows:

"Plant shook the door and said, "Open the door;" mother answered "No, what will I open the door for?" Plant said "We want the master of the house." Mother asked, "Why do you want to see him?" Plant answered, "We have business with him." Mother said, "he is not here, and it is just as well to say it to me as to him." Father then got off the bed and got under it. Plant shook the door again and said, "open the door; we want to search the house." Mother replied, "I told you he is not here." Plant then asked for some crackers. I went and got them, whilst mother stood by the door, fastening it. She took the crackers and tried to give them through a crevice between the logs near the door. Blanchard did not want to take them through the crevice; he wanted the door opened, but finally took them through the crevice. Plant then again said, "Open the door." Mother refused. He then again said "open the door or you will regret it." Mother replied, "No I will not open it." Father was then going to come out from under the bed; mother said to him, "for God's sake do not come out, it will be your death-blow." Father came out but went under it again. Blanchard then asked for some sugar; I got it, gave it to mother, and she tried to give it to them through the crevice; they declined taking it through the crevice, and Plant said, "If you don't open the door you will regret it;" "open the door right away;" "open the door; it is Dave Plant, who speaks with you to-night; when Dave Plant tells you to open your door, you must open right away." She then slid the cord along, and opened the door from six to twelve inches, passed out the sugar; they did not take it, but Plant took hold of her arm and squeezed it; mother told him to let go; he answered, "no I will not, I want you to open the door." Mother fainted; she did not fall, but leaned on the door; they soon took the sugar and put it in their whisky. They then left, going towards the house of Louis Robinson. He lives in the

same house with Thomas Ward. As they left they said, "Let us go towards Robinson's and see."

The prisoner then came out of his house, went to the house of Peter Closs, a near neighbor and brother-in-law, there obtained a double-barrelled shot gun, both barrels being already loaded with pigeon-shot. In about a quarter of an hour after he left his house, he returned with the gun, went into the net-house, looked around, and then went into his own house in company with Whitney. Whitney staid in the house a few minutes, then came out, did not go to bed again during the night, and went towards Thomas Ward's, where he heard the parties making a noise.

Plant, Robillard and the deceased, went to Robinson's house and asked for Thomas Ward. Ward and the family were in bed. They were told by Mrs. Robinson that he was not within. They insisted that he was. They were then told by Mrs. Robinson that she had a sick child. They said they didn't care a damn, they would come in any way, and if they couldn't come through the door, they would come through the roof. Mrs. Robinson then told them that Ward was in their net-house. They went to find him there, but not finding him, came back to the door, and said they would break the door open or come through the roof. Then Ward, who was in the house, spoke and told them to wait and he would go out. Ward got up, dressed himself, and went out. Plant asked Ward to go around with them. Ward refused. Plant asked Ward if he was afraid. Ward said he was afraid of going with them, they acted so mean. The deceased then put his hand on Ward's shoulder and told him not to be afraid, as they were not going to hurt him. The deceased then asked for something to eat. Ward went into the house to get something to eat, and whilst he was in for that purpose, the deceased stood by the door and told Ward not to be afraid, he wouldn't let any one in. Ward

came out with some bread and butter, and gave it to all three, which they ate. While eating the bread and butter the deceased said, "We have torn down half the net-house of Augustus Pond, coming along, and have left the rest, so when we go back we will have the rest of the fun." He also said, "I want to see Gust. Pond: he abused an Irishman, and I want to abuse him just as bad as he abused the Irishman." He also said, " Pond has to be abused any way." He further said, "Thomas, this is good bread; I don't know but it may be the last piece of bread I'll eat." On this same occasion Plant said, "I must have a fight with Gust. Pond, and if I can't whip him, Isaac will whip him."

The deceased was then standing by the side of Ward, and had his hand on Ward's shoulder. Plant spoke of the three as being an army, and said that he was captain, Robilliard was Bonaparte, and Blanchard was the soldier, and was to do what they ordered. Plant said he had wanted Blanchard to go into prisoner's house, and he was going to punish him by drinking three times to his drinking once, for not doing as he was told to do. Plant and Robilliard drank twice by the door. Ward then went into his house, and Plant, Robilliard and the deceased, went away towards George Porkains' house.

They soon returned, and in passing Ward's house, they were heard to say that "they were going back again; were going to find him, and to whip him, or have the soul out of him." In passing, the deceased stopped by Ward's net-house. Plant and Robilliard went on towards the prisoner's house, and when they were two or three hundred feet from Ward's, as judged by the sound, Plant hallooed for Isaac Blanchard, thus: "Isaac, come along; are you afraid? What in hell is the use of being afraid? Follow me, you follow a man." Blanchard replied, "I am not afraid," and he then went in the direction of the prisoner's house.

Plant, Robilliard and the deceased, then went to the door of the prisoner's house. They asked admission, which was refused by the prisoner's wife. She asked what they wanted. They replied that they wanted the master of the house, and that they wanted to come in and search the house. They were not admitted. The door was fastened with a cord.

The whole three then went to the prisoner's net-house. Robilliard and the deceased stood outside, and they commenced tearing down the net-house; at the same time Plant went inside, where Dennis Cull was sound asleep in bed. The first that Cull knew was his being pulled out of bed on to the floor. Plant was on top of him with his hand on his throat, choking him. Cull asked who it was choking him, but got no answer. Just at this time, whilst Plant was in the net-house and Robilliard and the deceased were tearing it down, the prisoner came to the door of his house, opened it, and hallooed thus : "Who is tearing down my net-house?" To this there was no response.

Near or about the same time, the voices of a woman and child were heard crying near the prisoner's house, and by the woman's voice the words "For God's sake" were spoken twice.

The boards were rattling at the same time that these voices of the woman and child were heard. The prisoner said, "Leave or I'll shoot," and after this the tearing down of the net-house continued. In about half a minute after the first order to leave, the prisoner said again, "Leave, or I'll shoot." These orders to leave were spoken with a loud voice.

A little before the firing of the gun, and whilst Plant was in the net-house, the cries of Cull were heard in the net-house. He hallooed as if he was in pain. He did not speak, but hallooed twice.

The boards stopped rattling about three or four seconds

before the gun was fired, and the gun was fired from two to four seconds after the prisoner's second order of "Leave, or I'll shoot."

The gun was fired a little before daybreak, on the morning of Saturday, the 18th of June. It was proved clearly that the prisoner fired it. It was a double-barrelled shot gun, loaded with pigeon shot. Only one barrel was discharged.

The deceased was found dead the next morning a little after daylight, in a small path in the bushes about two hundred and twelve feet from the door of the prisoner's house, with wounds upon his person from pigeon shot, sufficient to cause death.

On the same morning after day-break, and before sunrise, the prisoner, at the house of Mr. Beaudoin, his father-in-law, and who lived near, met his brother Louis Pond, who was a constable and acting as such, and residing at Seul Choix. Prisoner said to his brother that he had come to give himself up to him, to take him for what he had done; and that he wanted to reach Beaver Islands, to give himself up to the law. The Beaver Islands are about twenty-five miles from Seul Choix. He addressed these words to his brother, "I come and surrender myself to you." His brother did not take him, because, as he said, the prisoner's men understood the matter better than he did, and at that time the brother did not think of his being a constable, as he was very much confused and excited from the occurrence. The prisoner then engaged his two hired men, Whitney and Cull, to go with him to Beaver Islands. On applying to Whitney for the purpose, he said to him that he should have to go to Beaver Islands to give himself up, and requested them, Whitney and Cull, to go with him and row the boat. Whitney and Cull started with him for Beaver Islands about sunrise, in a boat, and when within about seven miles of said Islands, they were overtaken by a boat from

Seul Choix, containing Plant, Robillaird and three other persons, who took the prisoner into their boat, one of them being a constable, and brought him back to Seul Choix, and from there he was brought to the jail at Mackinac for confinement.

Wilson Newton was sworn as a witness for the prosecution, and he testified as to the different conversations and statements of the prisoner at different times concerning the homicide, after its occurrence. Upon his examination in chief, he testified that the prisoner said that Robilliard was on the roof of the net-house pulling the boards off; that Blanchard stood on the ground catching them, and he came out of his house and shot Blanchard, though he thought he had missed him, because he ran; that he couldn't tell how many there were together; that he fired into the pile, and as near as he could judge there were two or three; that Blanchard was on the run when he fired, and he fired with a shot gun that he got from a brother-in-law; that Blanchard stood with his side partly towards him, and that he couldn't tell how far it was to Blanchard from where he fired.

On the cross-examination, the witness testified, that the prisoner conversed with him fully and freely about the homicide. Prisoner told him the object of his going to Beaver Islands. He told the particulars of the homicide, as witness supposed, but witness was not sure that he (witness) recollected all. The prisoner explained to witness why he shot, and said: that Plant, Robilliard and the deceased, were prowling around his shanty; that they had been to his house more than once that night; that they wanted to come into his dwelling-house; that they tried to get in, and his wife held the door; that she kept the door fast and barred or held them out; that the first time they came they tore a part of the roof boards off; that he was under the bed when they were at the door, and he gave as a reason for going under the bed, that he was afraid of them;

that there was a quarrel between him and Plant; that he. was afraid they would flog him; that he had kept away from them from Thursday night till Saturday morning; that he had kept out of their sight as much as he could; that he had kept dodging them; that they threatened to tear down the roof of his dwelling, but was not positive whether prisoner said they threatened to do this the first or second time they came, on Friday night; and prisoner said he was afraid they would pull his heart out if they got hold of him, or his heart's blood, or something like that; and anyhow conveyed the idea that he was afraid of his life.

Some further evidence was given, and some questions arose as to the admissibility of evidence, but as these were not passed upon in this court, that portion of the bill of exceptions which presents them is omitted.

After counsel had summed up the cause, the court charged the jury generally in regard to the law of homicide as applied to this case, and farther instructed them as follows:

1. In regard to the ground of self-defense, the jury must be satisfied from the evidence, that it was rendered necessary from an attack then made upon the prisoner's person, by which his life was endangered, or he was in peril of great bodily injury, and such consequences could not otherwise be avoided; that in such cases it is the duty of the party to use other means, by retreating, or otherwise, if he can so avoid the apprehended consequence; that he can only resort to the taking of life by a deadly weapon, when the attack is being made so suddenly, and under such circumstances, that he could not by retreating or otherwise, avoid the apprehended injury; that the circumstances must appear from the evidence to have been such as to warrant this belief, and induce this conviction in the mind of the accused.

2. As to another ground of defense, the defense and protection of Dennis Cull, the prisoner's servant, the court charged in like manner, that the jury must be satisfied that

there was a like necessity from a like assault upon his life or person; and that if the jury should find from the evidence, that the prisoner thus took the life of the deceased, either in self-defense or in defense and protection of Cull, that they should acquit the prisoner.

3. As to another ground of defense, the attack upon and destruction of the prisoner's building called the net-house, the court charged, that while the prisoner would have a right to use ordinary measures to protect his net-house from injury and destruction, and to use force for that purpose, yet he had no right for that purpose to resort to a deadly weapon, and to take the gun, shoot and kill the deceased; that the resort to and firing of the gun for this purpose was unlawful, and the homicide in respect to this alleged ground of defense, was without sufficient excuse or justification; that the attack upon his building, and the injury to it, were a legal trespass, for which he might seek and have redress in the courts, but that he had no right to repel the same by firing the gun and shooting the deceased.

To this third instruction the prisoner excepted.

The prisoner by his counsel then prayed the court to instruct the jury:

1 That if, from all the evidence and circumstances proved, the jury find the prisoner had reasonable ground to believe that there was a design to destroy his life, or commit any felony on his person, and that the deceased was either the principal in such design, or present as accessory, the killing of the deceased will be excusable homicide, although it afterwards appear that no felony was intended.

Which instruction the court refused to give as prayed, but did instruct the jury as so requested, with the following addition and qualification: "That it must also appear from the circumstances, that the taking the life of the deceased was necessary for the purpose of saving his own

life, or protecting himself from such felony upon his person, and that the intent was then about being executed."

2. That if from all the evidence and circumstances proved, the jury find that the prisoner had reasonable grounds to believe that there was a design to destroy the life of the prisoner's servant, Dennis Cull, or commit any felony upon his person, and that the deceased was either the principal in such design, or present as accessory, the killing of the deceased will be excusable homicide.

Which instruction the court refused to give as prayed, except with the following qualification and addition : "That it must also appear that the intent was then being executed, and that the taking the life of the deceased was necessary for saving the life of the servant, or protecting him from such felony."

3. That if from all the evidence the jury find, that the homicide was committed in repelling the commission of a felony, or atrocious crime against the person of the prisoner, or of his servant, and if from all the evidence and all the circumstances as proved, the jury find that the prisoner used only the reasonable and necessary means to prevent it, the act of killing will be excusable homicide.

Which instruction the court refused to give as prayed, but did instruct the jury as requested, with the following addition and qualification; "If it could not otherwise be avoided."

4. That if from all the evidence, the jury find, that the homicide was committed in repelling the commission of a burglary or other felony upon the dwelling of the prisoner, and if from all the evidence and all the circumstances as proved, the jury find that the prisoner used only the reasonable and necessary means to prevent it, the act of killing will be justifiable homicide.

5. That if from all the evidence, the jury find that the net-house of the prisoner was an appurtenance, or outbuilding, of the prisoner's dwelling, and parcel of the mes-

suage, and was regularly and ordinarily slept in at the time of the homicide by the prisoner's servants and members of his family, it was a dwelling within the meaning of the law; and if they further find, that the homicide was commited in repelling the commission of a burglary, or other felony on said building, by the deceased either as principal or accessory, and the prisoner used only the reasonable and necessary means to prevent it, the act of killing will be justifiable homicide.

6. That if from all the evidence, the jury find that the homicide was committed in repelling the commission of an atrocious crime against the prisoner's property, by the deceased as principal, or as aider and abettor, and that the prisoner used only the reasonable and necessary means to prevent it, the act of killing will be justifiable homicide.

7. That if from all the evidence, the jury find that the deceased was engaged at the time of the homicide as principal or accessory, in breaking and entering in the night time the prisoner's dwelling, with intent willfully and maliciously to destroy or injure the same, or to commit any other felony, and if they further find that the homicide was commited in repelling the same, and the prisoner used only the reasonable and necessary means to prevent it, the act of killing will be justifiable homicide.

8. That if from all the evidence, the jury find that the homicide was committed in repelling the willful and malicious destruction or injury of the prisoner's building, and the prisoner used only the reasonable and necessary means to prevent it, the act of killing will be justifiable homicde.

9. That a man's house is his castle, and that the making an attack upon a dwelling, and especially in the night, the law regards as equivalent to an assault upon a man's person; and if from all the evidence, the jury find that the homicide was comitted in repelling a willful, malicious and destructive attack upon the prisoner's dwelling, in such case the prisoner was not bound to retreat or abandon the dwelling

to his adversary. And if the jury then find that the prisoner used only the reasonable and necessary means to prevent the attack, the killing will be justifiable homicide.

Which said instructions, numberd 4, 5, 6, 7, 8, and 9, the court refused to give, and the prisoner excepted.

10. That the prisoner had a right to judge and act upon the facts and circumstances which surrounded him, and as they appeared to him at the time of the homicide, and if from all the evidence, the jury find that the homicide was committed in repelling the *willful and malicious destruction of the prisoner's building*, and the prisoner used only the reasonable and necessary means to prevent it, the act of killing will be justifiable homicide.

Which said instruction the court refused to give as prayed, except with the following addition and qualification; " but he could not take life in so doing, or use a dangerous or deadly weapon for that purpose."

As to the fourth instruction above prayed, the court had in the general charge to the jury, instructed them that a man's dwelling-house is his castle; that if the deceased and those acting with him, had made an attack on the dwelling-house occupied by the prisoner with his wife and children, and attempted to break and enter it for any unlawful purpose, the prisoner would have the right to repel the same by force, and prevent its consummation, and in doing so, take life, if necessary for that purpose; and the court had already charged fully as above shown, in relation to the alleged injury to, and destruction of the net-house. Said fourth instruction was refused, because the court had already charged fully in respect to it; and further there was no evidence, nor was it insisted or claimed that there was any, tending to show such burglary or felony upon the dwelling-house occupied by the prisoner with his wife and children. But the prisoner's counsel claimed and insisted, that the net-house, under the evidence, was in law a dwelling-house of the prisoner, and that on that ground, and on the evidence, the jury should be instructed as in said fourth instruction above prayed.

As to the seventh instruction above prayed, the court had already fully charged as above stated in reference to the fourth instruction, and there was no evidence, nor was it insisted or claimed that there was any, tending to show any such attack upon the prisoner's dwelling occupied by him with his wife and children; and so also as to the ninth instruction above prayed.

The subject of the 5th, 6th and 8th instructions above prayed, the court thought had already been covered by the general charge as above shown, in reference to the defense alleged, based on the attack upon and injury to the net - house.

The jury having found the prisoner guilty of manslaughter, the court sentenced him to confinement at hard labor in the State Prison for the period of ten years.

*Buel & Trowbridge*, for plaintiff in error:

The *main* questions arising in this case are:

1st. Whether the prisoner had a right to act upon the circumstances as they appeared to him, and whether he would be justified if he committed the homicide in the real and honest belief that he or his servant were in great danger of death or serious bodily harm, although it should afterwards turn out that he was mistaken, and there was in fact neither design to do harm or serious injury, nor danger that it would be done.

" When from the nature of the attack, there is *reasonable ground to believe* that there is a design to destroy his life, or commit any felony on his person, the killing of the assailant will be excusable homicide, *although it should afterwards appear that no felony was intended.*"— *Commonwealth v. Selfridge, Whart. Hom. app. 417, 456.*

The Supreme Court of this state has adopted the decision in Selfridge's case *in totidem verbis;* and commented on it as expressing the well established and recognized doctrine on this subject: — *People v. Doe,* 1 *Mich.* 457.

The *intent* constitutes the essence of every crime ; and therefore if a man kill another, really and honestly *believing* himself to be in great danger of death or serious bodily harm, it is neither murder nor manslaughter, but self defense; and he will be held excusable, although it should afterwards turn out that he was mistaken, and there was really no necessity for the extreme measure: — *Granger v. State*, 5 *Yerg.* 459.

This doctrine is fully sustained by the following authorities : — *Shorter v. People*, 2 *Comst.* 197, 202 ; *Mead's case*, 1 *Lewis C. C.* 184, cited in *Roscoe's Cr. Ev.* 771–2 ; *People v. Rector*, 19 *Wend.* 589 ; *U. S. v. Wiltberger*, 3 *Wash. C. C.* 515, 521 ; *Scully's case*, 1 *C. & P.* 319 ; *Commonwealth v. Riley*, *Thatch. C. C.* 475.

2d. Whether, under the evidence and circumstances as proved, the "net-house" was a dwelling of the prisoner.

Any house for the dwelling and habitation of man is a dwelling-house, wherein burglary may be committed : — 2 *East P. C.* 491 ; *Armour v. State*, 3 *Humph.* 387.

A dwelling-house need not be under one roof. It may be a cluster of separate buildings, and it includes the outhouses and all buildings in the cluster appurtenant and auxilliary, being parcel of the messuage, and within the curtilage, and which are subservient to the main dwelling for the purpose of habitation : — 1 *Bish. Cr. L.* §§ 165, 170, 171; 3 *Greenl. Ev.* § 80 ; *Whart. Cr. L.* §§ 1557, 1560, 1561; *Rex v. Walters*, 1 *Moody*, 13 ; *Rex v. Clayborn*, *Russ. & Ry.* 360 ; *State v. Langford*, 1 *Dev.* 253.

An enclosure or fence is not essential : — 1 *Bish. Cr. L.* § 171 ; 3 *Greenl. Ev.* § 80 ; *People v. Taylor*, 2 *Mich.* 250.

But if the net - house, as an out - building, was not legally part of the prisoner's main dwelling, *then it was a distinct dwelling of the prisoner if slept in by his servants :* — 1 *Bish. Cr. L.* § 166 ; *Rosc. Cr. Ev.* 348 ; *Whart. Cr. L.* § 1562 ; *Westwood's case*, *Russ. & Ry.* 495 ; *Stock's case*, 2 *Taunt.*

8 MICH.—M

339; *Russ. & Ry.* 185; *Smith's case,* 1 *Moody & Rob.* 256; *Armour v. State,* 3 *Humph.* 379.

3d. Whether the prisoner had a right to resort to the use of deadly weapons in repelling the wilful and malicious destruction of his building.

Blackstone says, that "such homicide as is committed for the *prevention* of any forcible and atrocious crime, is justifiable by the law of nature, and also by the law of England as it stood as early as the time of Bracton:"—4 *Bl. Com.* 180.

A man may repel force by force in defense of his person, habitation or property, against any one who manifestly intends or endeavors by violence or surprise to commit a known felony on either, and if he kill him in so doing, it is justifiable homicide:—1 *East P. C.* 271; *Foster,* 273; 2 *Bish. Cr. L.* §§ 553, 569; *Gray v. Combs,* 7 *J. J. Marsh.* 482; *U. S. v. Travers,* (*Justice Story's opinion*), 2 *Whart. Cr. C.* 497; *Hinchliff's case,* 1 *Lewin Cr. C.* 168. See also the law of riots and riotous' homicide:—*Whart. Hom.* 352; *Whart. Cr. L.* § 1024. It must logically follow from this rule, that a man may use whatever force may be necessary to make his defense effectual; otherwise the rule is a nullity, and means nothing.

The court instructed the jury "that the attack upon the prisoner's building, and the injury to it, were a legal trespass, for which he might seek redress in the courts." This proposition is technically correct, as it would be in any case of burglary, arson, or any other criminal assault upon property. But taken in connection with the *context* of the charge, and as a naked proposition, it being so delivered without explanation of its *whole* bearing and application, and without the *slightest* notice of distinction between the right to repel a mere *legal* and *civil trespass* on property, and the right to repel its *felonious* and *criminal destruction* or *injury*, the proposition was well calculated to confound and mislead the jury, and lead

them to suppose that the prisoner had no remedy against the crime by using reasonable and necessary means to prevent it, and that he had no other remedy than to *submit* to the crime, if he could not *peaceably* prevent it, and then "seek redress in the courts" by civil suit for the value of the property destroyed. It is submitted that such is not the spirit nor the letter of our enlightened system of jurisprudence.

There is a clear distinction noticed by all the authorities between the right of defense against a felonious or criminal attack upon property, and of defense against a mere trespass, which the court in this case entirely overlooked.

A mere legal trespass is a private wrong, and no crime. A crime is a public wrong, and, according to its nature, may or may not be a legal trespass or private wrong. For the private wrong or trespass, in either case, the law awards to the injured party his damages or compensation. But for the crime or public wrong, the law awards no compensation, but punishment.

There is, therefore, ample reason why a mere legal trespass or private wrong should not be resisted unto death. It has its ample remedy.

Not so with a crime or public wrong, for which, when once committed, there is no remedy, though it may be punished. The law of society, the public safety, therefore, requires that crime be resisted and prevented; and hence every citizen is invested not only with the right but duty to repel and prevent it; but the means employed must appear to be necessary and reasonable for the purpose, in view of the nature of the crime and all the circumstances of the case.

All crime, therefore, can and should be resisted; but whether the degree of force used be necessary, and whether resistance unto death be justifiable in any particular case, are not matters of law for the court, but fact for the jury,

to be submitted to them under the law and the evidence, which in the present case the court refused to do: — *State v. Clement,* 32 *Me.* 279; *U. S. v. Wiltberger,* 3 *Wash. C. C.* 521; and the authorities generally.

*J. M. Howard, Attorney General,* for the People:

Under our statute, the destruction of the net-house was undoubtedly a felony, but not such a felony as the law requires to justify the slaying of the offender in order to prevent it. While a man may use all reasonable and necessary force to defend his real or personal estate, of which he is the actual possessor, against another who comes to dispossess him without right, he can never innocently carry his · defense to the extent of killing the aggressor: — 2 *Bish. Cr. L.* § 558; 1 *Ibid.* §§ 549, 559, 622; 4 *Mass.* 391; 1 *C. & Marsh.* 209; 32 *Me.* 279; 1 *Mich.* 456. The attack upon the net-house, though technically a felony, was in its nature a mere trespass, and it is believed that no adjudicated case can be found where the act of committing a mere trespass has been held to justify and excuse a homicide.

The net-house was not the prisoner's dwelling-house. To make such an out house a subject of burglary, the dwelling-house proper and the out house must be enclosed by a common fence: — 3 *Greenl. Ev.* §§ 79, 80; 4 *Bl. Com.* 224; 1 *Russ. & Ry.* 187. Though a man may occupy two dwelling-houses, yet the structure must possess such qualities as indicate that it is intended as a residence and habitation: — 1 *Bish. Cr. L.* § 166. Sleeping in it is not alone sufficient: — 2 *East P. C.* 499.

The mere assault and battery upon Cull, unaccompanied by imminent danger to the life of the assailed, will not justify killing the assailant: — 2 *Bish.* §§ 544, 550, 281; and see 11 *Mod.* 242; *McLeod's case,* 1 *Hill,* 377, 419, 420; *Webster's Works, Vol.* 6 *p.* 261.

CAMPBELL J.:

The defense of this case, as presented in the court below, was based upon a claim that the accused was only chargeable with excusable or justifiable homicide. And as most of the questions raised before us involve the consideration of the same subject, it may be necessary to examine somewhat carefully into the rules which divide homicide into its various heads, and determine the character of each act of slaying.

The facts are claimed, by the counsel for the accused, to have a tendency to establish the act as innocent on various grounds: *first*, as excusable in defence of himself or his servant; *second*, as justifiable in repelling a riotous attack, and *third*, as justifiable in resisting a felony.

The first inquiry necessary, is one which applies equally to all of the grounds of defense; and is whether the necessity of taking life, in order to excuse or justify the slayer, must be one arising out of actual and imminent danger; or whether he may act upon a belief, arising from appearances which give him reasonable cause for it, that the danger is actual and imminent, although he may turn out to be mistaken.

Human life is not to be lightly disregarded, and the law will not permit it to be destroyed unless upon urgent occasion. But the rules which make it excusable or justifiable to destroy it under some circumstances, are really meant to ensure its general protection. They are designed to prevent reckless and wicked men from assailing peaceable members of society, by exposing them to the danger of fatal resistance at the hands of those whom they wantonly attack, and put in peril or fear of great injury or death. And such rules, in order to be of any value, must be in some reasonable degree accommodated to human character and necessity. They should not be allowed to entrap or mislead those whose misfortunes compel a resort to them.

Were a man charged with crime to be held to a knowledge of all facts precisely as they are, there could be few cases in which the most innocent intention or honest zeal could justify or excuse homicide. The jury, by a careful sifting of witnesses on both sides, in cool blood, and · aided by the comments of court and counsel, may arrive at a tolerably just conclusion on the circumstances of an assault. But the prisoner, who is to justify himself, can hardly be expected to be entirely cool in a deadly affray, or in all cases to have¹ great courage or large intellect; and can not well see the true meaning of all that occurs at the time; while he can know nothing whatever concerning what has occurred elsewhere, or concerning the designs of his assailants, any more than can be inferred from appearances. And the law, while it will not generally excuse mistakes of law (because every man is bound to know that), does not hold men responsible for a knowledge of facts unless their ignorance arises from fault or negligence.

A criminal intent is a necessary ingredient of every crime. And therefore it is well remarked by Baron Parke in *Regina v. Thurborn*, 2 *C. & K.* 832, that "as the rule of law, founded on justice and reason, is that *actus non facit reum nisi mens sit rea*, the guilt of the accused must depend on the circumstances as they appear to him." And Mr. Bishop has expressed the same rule very clearly, by declaring that "in all cases where a party, without fault or carelessness, is misled concerning facts, and acts as he would be justified in doing if the facts were what he believed them to be, he is legally as he is morally innocent:— 1 *Bish. Cr. L.* § 242.

These principles have always been recognized, and are sustained by numerous authorities; but they need no vindication, and a further citation would add nothing to the clear and intelligible statements already referred to. And from an examination of some of the charges given, we

are very much inclined to believe that the court below entertained the same views, at least as to some branches of the defense. But as some of the charges actually given, and particularly those in response to the first and second instructions requested, negative this rule, and the jury upon those must have been misled, we must regard these charges as erroneous unless they were inapplicable to the case altogether. Their applicability will be presently considered.

In order to determine the materiality of the questions of law raised, it becomes necessary to determine under what circumstances homicide is excusable or justifiable. In doing this, it will be proper .to advert merely to those instances which may be regarded as coming nearest to the circumstances of the case before us. The other cases we are not called upon to define or consider; and what we say is to be interpreted by the case before us.

The only variety of excusable homicide (as contra-distinguished from justifiable homicide at common law) which we need advert to, is that which is technically termed homicide *se aut sua defendendo*, and which embraces the defense of one's own life, or that of his family, relatives or dependants, within those relations where the law permits the defense of others as of one's self. Practically, so far as punishment is concerned, there is no distinction with us between excusable and justifiable homicide; but a resort to common law distinctions will nevertheless be convenient, in order to illustrate the difference between the various instances of homicide in repelling assaults, according as they are or are not felonious. Homicide *se defendendo* was excusable at common law when it occurred in a sudden affray, or in repelling an attack not made with a felonious design. According to Mr. Hawkins, it was excusable and not justifiable because, occurring in a quarrel, it generally assumed some fault on both sides : — *Hawk. P. C., B.* 1 *Ch.* 28, § 24. In these cases, the original assault not being with a feloni-

ous intent, and the danger arising in the heat of blood on one or both sides, the homicide is not excused unless the slayer does all which is reasonably in his power to avoid the necessity of extreme resistance, by retreating where retreat is safe, or by any other expedient which is attainable. He is bound, if possible, to get out of his adversary's way, and has no right to stand up and resist if he can safely retreat or escape:— See 2 *Bish. Cr. L.* §§ 543 to 552, 560 to 562, 564 to 568; *People v. Sullivan,* 3 *Seld.* 396; 1 *Russ. Cr.* 660 *et seq.* Mr Russell lays down the rule very concisely as follows (*p.* 661) : "The party assaulted must therefore flee, as far as he conveniently can, either by reason of some wall, ditch, or other impediment, or as far as the fierceness of the assault will permit him; for it may be so fierce as not to allow him to yield a step without manifest danger of his life or great bodily harm; and then, in his defense, he may kill his assailant instantly. Before a person can avail himself of the defense that he used a weapon in defense of his life, he must satisfy the jury that that defense was necessary; that he did all he could to avoid it; and that it was necessary to protect his own life, or to protect himself from such serious bodily harm as would give him a reasonable apprehension that his life was in immediate danger. If he used the weapon having no other means of resistance, and no means of escape, in such case, if he retreated as far as he could, he would be justified." A man may defend his family, his servants or his master, whenever he may defend himself. How much further this mutual right exists, it is unnecessary in this case to consider:— See 2 *Bish. Cr. L.* §581, *and cases cited ;* 1 *Russ. Cr.* 662; 4 *Bl. Com.* 184.

There are many curious and nice questions concerning the extent of the right of self defence, where the assailed party is in fault. But as neither Pond nor Cull were in any way to blame in bringing about the events of Friday night, which led to the shooting of Blanchard, it is not

important to examine them. The danger to be resisted must be to life, or of serious bodily harm of a permanent character; and it must be unavoidable by other means. Of course we refer to means within the power of the slayer, so far as he is able to judge from the circumstances as they appear to him at the time.

A man is not, however, obliged to retreat if assaulted in his dwelling, but may use such means as are absolutely necessary to repel the assailant from his house, or to prevent his forcible entry, even to the taking of life. But here, as in, the other cases, he must not take life if he can otherwise arrest or repel the assailant: — 2 *Bish. Cr. L.* § 569; 3 *Greenl. Ev.* § 117; *Hawk. P. C., B.* 1 *Ch.* 28, § 23. Where the assault or breaking is felonious, the homicide becomes justifiable, and not merely excusable.

The essential difference between excusable and justifiable homicide rests not merely in the fact that at common law the one was felonious, although pardoned of course, while the other was innocent. Those only were justifiable homicides where the slayer was regarded as promoting justice, and performing a public duty; and the question of personal danger did not necessarily arise, although it does generally.

It is held to be the duty of every one who sees a felony attempted by violence, to prevent it if possible; and in the performance of this duty, which is an active one, there is a legal right to use all necessary means to make the resistance effectual. Where a felonious act is not of a violent or forcible character, as in picking pockets, and crimes partaking of fraud rather than force, there is no necessity, and therefore no justification, for homicide, unless possibly in some exceptional cases. The rule extends only to cases of felony; and in those it is lawful to resist force by force. If any forcible attempt is made, with a felonious intent against person or property, the person resisting is not obliged to retreat, but may pursue

his adversary, if necessary, till he finds himself out of danger. Life may not properly be taken under this rule where the evil may be prevented by other means within the power of the person who interferes against the felon. Reasonable apprehension, however, is sufficient here, precisely as in all other cases.

It has also been laid down by the authorities, that private persons may forcibly interfere to suppress a riot or resist rioters, although a riot is not necessarily a felony in itself. This is owing to the nature of the offense, which requires the combination of three or more persons, assembling together and actually accomplishing some object calculated to terrify others. Private persons who can not otherwise suppress them, or defend themselves from them, may justify homicide in killing them, as it is their right and duty to aid in preserving the peace. And perhaps no case can arise where a felonious attempt by a single individual will be as likely to inspire terror as the turbulent acts of rioters. And a very limited knowledge of human nature is sufficient to inform us, that when men combine to do an injury to the person or property of others, of such a nature as to involve excitement and provoke resistance, they are not likely to stop at half way measures, or to scan closely the dividing line between felonies and misdemeanors. But when the act they meditate is in itself felonious, and of a violent character, it is manifest that strong measures will generally be required for their effectual suppression; and a man who defends himself, his family or his property, under such circumstances, is justified in making as complete a defense as is necessary.

When we look at the facts of this case, we find very strong circumstances to bring the act of Pond within each of the defenses we have referred to. Without stopping to recapitulate the testimony in full or in detail, we have these leading features presented: Without any cause or provocation given by Pond, we find Plant, Robilliard and

Blanchard, combining with an expressed intention to do him personal violence. On Thursday evening this gang, with from fifteen to twenty associates, having been hunting for Pond, found him at a neighbors, and having got him out of doors, surrounded him, while Plant struck him with his fist, and kicked him in the breast, with insulting language, evidently designed to draw him into a fight. He escaped from them, and ran away into the woods, and succeeded in avoiding them that night. That same night they tore down the door of the net-house, where his servants were asleep, in search of him; and not finding him there, went to the house; the whole rabble being with them; and wanted Pond, and expressed themselves determined to have him; but refused to tell his wife what they wanted of him. Not finding him there, they started off elsewhere in search of him. This was between nine and ten o'clock at night. About noon of Friday, Plant and Blanchard met Pond, when Plant threatened again to whip him; and then went up to him, told him not to say anything, and that if he did he would give him slaps or kicks. Plant then took a stone in his hand, and threatened if Pond spoke, to throw it at him. Pond said nothing, but went home quietly, and Plant went off and was heard making further threats soon after. Friday night neither Pond nor his family went to bed, being in fear of violence. Between one and two o'clock that night, Plant, Robilliard and Blanchard went to the net-house, and partially tore it down, while Whitney and Cull were in it. They then went to the house where Pond, his wife and children were, shook the door, and said they wanted Pond. Pond concealed himself under the bed, and his wife demanded what they wanted of him, saying he was not there; when Plant shook the door again, and ordered Mrs. Pond to open it; saying they wanted to search the house. She refusing, they resorted to artifice, asking for various articles of food, and objecting to receiving them except through the door. Plant then repeatedly

commanded her to open the door, saying if she did not, she would regret it. On opening the door from six to twelve inches, by sliding the cord, to hand them some sugar, which they demanded, they did not take the .sugar, but Plant seized Mrs. Pond's arm, and squeezed it until she fainted. Not succeeding in getting into the house, they then left for Ward's, and Pond went to the house of his brother-in-law, and borrowed a double barreled shot gun loaded with pigeon shot, and returned home. While at Ward's, Blanchard told the latter that they had torn down part of Pond's net-house, and had left the rest so that when they went back they would have the rest of the fun. Blanchard also said, "I want to see Gust. Pond: he abused an Irishman, and I want to abuse him just as bad as he abused the Irishman. Pond has to be abused any way." He also said to Ward, "this is good bread, I don't know but it may be the last piece of bread I'll eat." Plant also made threats. A short time after returning, they were heard to say they were going back again; were going to find him and to whip him, or have the soul out of him. It is to be remarked that we have their language as rendered by an interpreter, who was evidently illiterate, or at least incompetent to translate into very good English; and it is impossible for us to determine the exact force of what was said.

The party then went back to Pond's, and asked admittance to search for him. His wife refused to let them in. They immediately went to the net-house, where Cull was asleep. Plant seized Cull, and pulled him out of bed on the floor, and began choking him. Cull demanded who it was, but received no answer. Blanchard and Robilliard had commenced tearing down the boards. Pond went to the door and hallooed, "Who is tearing down my net-house?" to which there was no answer. The voices of a woman and child were heard crying, and the woman's voice was heard twice to cry out "for God's sake!" Cull's voice was also heard from the net-house, not speaking, but

hallooing as if he was in pain. Pond cried out loudly "leave or I'll shoot." The noise continuing, he gave the same warning again, and in a few seconds shot off one barrel of the gun. Blanchard was found dead the next morning. Pond took immediate steps to surrender himself to justice.

A question was raised whether the net-house was a dwelling or a part of the dwelling of Pond. We think it was. It was near the other building, and was used not only for preserving the nets which were used in the ordinary occupation of Pond, as a fisherman, but also as a permanent dormitory for his servants. It was held in *The People v. Taylor,* 2 *Mich.* 250, that a fence was not necessary to include buildings within the curtilage, if within a space no larger than that usually occupied for the purposes of the dwelling and customary out-buildings. It is a very common thing in the newer parts of the country, where, from the nature of the materials used, a large building is not readily made, to have two or more small buildings, with one or two rooms in each, instead of a large building divided into apartments.

We can not, upon a consideration of the facts manifest from the bill of exceptions, regard the charges asked by the defense as abstract or inapplicable to the case. It was for the jury to consider the whole chain of proof; but if they believed the evidence as spread out upon the case, we feel constrained to say that there are very few of the precedents which have shown stronger grounds of justification than those which are found here. Instead of reckless ferocity, the facts display a very commendable moderation.

Apart from its character as a dwelling, which was denied by the court below, the attack upon the net-house for the purpose of destroying it, was a violent and forcible felony. And the fact that it is a statutory and not common law felony, does not, in our view, change its character. Rape and many other of the most atrocious felonious assaults, are statutory felonies only, and yet no

one ever doubted the right to resist them unto death. And a breaking into a house with the design of stealing the most trifling article, being common law burglary, was likewise allowed to be resisted in like manner, if necessary. We think there is no reason for making any distinctions between common law and statute felonies in this respect, if they are forcible and violent. So far as the manifest danger to Pond himself, and to Cull, is concerned, the justification would fall within the common law.

It is claimed by the prisoner's counsel, that we are authorized to pronounce upon the case the judgment which the facts warrant. Had the facts spread out in the bill of exceptions been found as a special verdict by the jury, this would be true. But as the case stands, we can only consider them as bearing upon the instructions given or refused. The errors being in the rulings, and not in the record outside of the bill of exceptions, we can do nothing more, in reversing the judgment, than to order a new trial. The District Judge has ruled upon the law questions in such a way as to present them all fairly as questions not before decided in this state. We think there was error in requiring the actual instead of apparent and reasonably founded causes of apprehension of injury; in holding that the protection of the net-house could not be made by using a dangerous weapon; and that the conduct of the assailing party was not felonious; and also in using language calculated to mislead the jury upon the means and extent of resistance justifiable in resisting a felony.

We do not deem it necessary to pass upon the minor points, as we do not suppose the authorities will deem it important to proceed further, unless the facts are very different from those presented.

The judgment below must be reversed and a new trial granted.

MANNING and CHRISTIANCY JJ., concurred.

MARTIN CH. J., concurred in the result.