## J. Richardson *v.* The State.

1. Practice. — After verdict it is too late to object, for the first time, that no copy of the indictment in a capital case was served on the defendant. Questions of this character, however, especially in capital cases, should always be obviated by a strict compliance with the injunctions of the law. If the defendant waives the copy, the better practice would be to take the waiver in writing, over his signature, and have it filed among the papers in the case.

2. Same. — Defendant is not entitled to a list of talesmen summoned to complete the panel after the special *venire* has been exhausted.

3. Murder — Evidence. — It being in proof that the deceased, after being shot, was found close to the house of the defendant, and that there were spots of blood on the fence adjacent thereto, the prosecution asked a witness, "How did those bloody spots appear to have been made?" to which the defence objected that the question sought to elicit an opinion, not a fact. The objection was overruled, and the witness described the spots, and said they appeared to have been made with a bloody hand. *Held,* that the objection was properly overruled; the prosecution had the right to prove the appearance of the spots, and the question was a legitimate one to elicit the proof.

4. Verdict. — The presence of the accused, but not that of his counsel, is necessary when the verdict is received.

5. Justifiable Homicide. — There is no positive definition of justifiable homicide, and, the justification being determinable by the circumstances of each particular case, the mere enunciation of the statutory provisions on the subject will often be inadequate in a charge to the jury.

6. Self-Defence. — The criterion of justifiable homicide in self-defence, or in defence of family or home, is not the actuality of impending danger, but the appearance and reasonable apprehension of such danger. Note in the opinion the elaboration of this principle.

Appeal from the District Court of Smith. Tried below before the Hon. J. C. Robertson.

Appellant was indicted for the murder of Michael See, by

shooting him with a gun on the 7th of August, 1873. The trial was had at the September term, 1879, of the court below, and resulted in his conviction of murder in the first degree, and the assessment of his punishment at death.

It appears from the evidence that the deceased was a clerk of S. Wilkins, at Gladewater, who, on the 7th of August, 1873, dispatched him on horseback to Tyler in Smith County, instructing him to travel the direct road. Deceased took with him two derringer pistols, and about $70. Late in the night of that day he was shot in or close to the yard of the defendant, a negro, who did not live on any public road to Tyler or elsewhere. It appears that the house was some three hundred yards from a road which leads to Tyler, and screened therefrom by timber; but it does not appear whether or not this was the direct road to Tyler from Gladewater.

W. S. Wimberly, upon whose plantation the defendant and other negroes lived, was awakened by some of them about midnight, and informed that some one had been shot at the defendant's. He dressed and repaired to the place, and found the deceased lying a few steps outside of the defendant's yard, but still alive. Henry Tucker told the deceased that he needed some attention, and asked if he could do any thing for him; to which the deceased replied, "Get away from me, and go to h—ll." Two derringer pistols and a bottle of whiskey were lying inside of the yard, and a horse was hitched at the gap, with saddle-bags on him. The deceased, when found, had on no pants, drawers, or shoes. These articles were found on the ground, just outside the yard. The pants and drawers were bloody, and had a hole through them below the waistband. A silver half-dollar and a dime were found in the pockets, but no other money.

Emily Johnson, a colored woman who lived with her husband about one hundred and fifty yards from the defendant's, testified that between eleven and twelve o'clock in the

night of the homicide she heard some one halloo at their gate. Not knowing who it could be at that hour, she would not answer nor let her husband answer; and very soon she heard some one in her kitchen, and in a few minutes the door between her kitchen and bedroom was opened, and a man came in and advanced to the bed occupied by herself and husband, and looked into their faces, and then went to another bed, in which their little daughter and a young woman were lying, and got in the bed with them. Her husband got up and asked him, "In the name of God, stranger, what do you want?" at which the man jumped up, pulled a quilt over his head, and got under the bed. Her husband spoke to him again, and the man came out from under the bed and said he did not mean any harm and would not hurt them. He asked for water, and it was given him; and he then sent witness out of doors for his shoes, which he had pulled off and left there, and she went out and brought them in. He asked her husband to walk out with him, and offered him a pistol to defend himself with, if any harm was attempted. They went out, but stopped near the door, and the man told her husband he wanted a woman, and offered her husband half a dollar to get him one. Her husband refused; and the man then gave him a drink of whiskey, and asked him if there were any other negro cabins close by. Her husband told him the defendant lived about one hundred and fifty yards distant, and had two daughters. The man tried to get her husband to go with him to defendant's, and, being refused, got on his horse and started in that direction, telling her husband that if there were no girls at the defendant's he would come back and kill him. Witness's husband started to Mr. Wimberly's, in an opposite direction from the defendant's, to inform Mr. Wimberly of the man's conduct, and witness and her children went out in the field and hid. About half an hour after the man left her house, she heard a gun at the defendant's house; and on going down the next morning,

saw the deceased, and knew him to be the same man who was at her house on the previous night. She heard him groaning through the night, and last heard his groans when the chickens were crowing for day. When witness got to defendant's he was not there; he had run off. Her husband had departed life since the homicide.

Alf. Tucker, who at the time of the homicide lived about a mile east of Tyler and about seven miles west of the defendant's, testified that, about daylight in the morning after the killing the defendant came to his house, and, after some casual conversation, said there was a man killed at his house last night. Witness asked by whom; and the defendant replied that his wife killed the man, who was either trying to ravish her or to break into the house; witness could not remember which was the reason stated by the defendant. Witness told him, d—n him, he ought to have killed the man himself, and not let his wife do it. Defendant asked whether the prosecution would go easier against him or his wife. Defendant said he left after the man was killed, but afterwards went back and found a roll of money, amounting to $60 or $70, in the road in front of the house, and took it. Witness had known the defendant for about two years prior to the homicide; and did not remember ever mentioning the interview with him until the morning of the day on which he was examined at this trial.

Matters immediately involved in the rulings are stated in the opinion.

*Horace Chilton*, who defended the appellant by appointment of the court below, filed in this court an able and forcible brief and argument.

*Thomas Ball*, Assistant Attorney-General, for the State.

WHITE, P. J. In capital cases, it is provided that "no arraignment shall take place until the expiration of at least two entire days after the day on which a copy of the indictment was served on the defendant, unless the right to such

copy or to such delay be waived, or unless defendant is on bail.'' Rev. Code Cr. Proc., art. 510. We apprehend, however, that no case can be found holding that the objection of no service of such copy can be raised for the first time, as in this case, on motion for a new trial. True, in the case of *Record* v. *The State*, 36 Texas, 521, it is intimated that such practice was proper, but the exact question was not raised, nor was it essential that it should have been passed upon in that case. Wherever it has been properly submitted, it has been held that it was too late to interpose such objection after verdict and in a motion for a new trial. *Roberts* v. *The State*, 5 Texas Ct. App. 141, and authorities cited.

Such questions should not be permitted to arise, and especially in capital cases; because, in addition to his constitutional right, upon demand, to have a copy of the nature and cause of the accusation against him (Const., art. 1, sect. 10), the statute prescribes that '' in every case of felony, when the accused is in custody, or as soon as he may be arrested, it shall be the duty of the clerk of the court where an indictment has been presented, immediately to make out a certified copy of the same, and deliver such copy to the sheriff, with a writ directed to such sheriff, commanding him forthwith to deliver such certified copy to the defendant.'' And the sheriff is required to execute and return '' the same, with his indorsement thereon showing when and how the same was executed.'' Rev. Code Cr. Proc., arts. 504, 505. Whilst it is true that this privilege and right may be waived by a defendant, his having done so should not be left in uncertainty; but the better practice would be to have the waiver reduced to writing, signed, and filed with the papers of the case. If the objections as here presented in the bill of exceptions had been urged before a plea was entered, a refusal to have granted it would have required a reversal of the judgment. *McDuff* v. *The State*, 4 Texas Ct. App. 58.

A second error complained of is, that out of a special

*venire* ordered of forty-eight men only sixteen were summoned. Defendant asked that, on account of the great disproportion in the number summoned, the trial should be postponed until another day of the term, and another special *venire* ordered, returnable on that day ; or that the case be continued. This application was refused and the trial proceeded, five jurors being obtained out of the sixteen, and the court ordering the sheriff to summon talesmen to fill the panel. As shown by the bill of exceptions, we cannot determine whether or not the officer has failed or neglected to do his duty. The return of the sheriff on the writ for the special *venire* should have been made an exhibit to the bill. Rev. Code Cr. Proc., art. 614. In the absence of this return, we must presume that the officer did his full duty. Upon a similar question in the case of *Johnson* v. *The State*, 4 Texas Ct. App. 268, it was said : " In proportion to the number of the special *venire*, we admit that the deficit [fourteen out of thirty-six] is quite large ; and the proper and better practice, where there is a large deficiency, doubtless is to order the talesmen, and, after they have also been summoned, to then have the defendant served with the full list so completed. We know, however, of no provision of the statute requiring this to be done ; in fact, the law seems to be defective in that it provides for no such contingency. No such right being accorded to defendant, and his objection failing to show that the jury as selected, or any individual juror, was wanting in any of the qualifications prescribed by law, this court will not revise and reverse the action of the lower court in this particular, when, to say the least of it, the action was not illegal." The same rule was held in *Roberts* v. *The State*, 5 Texas Ct. App. 141. See also *Boyett* v. *The State*, 2 Texas Ct. App. 93 ; *Harris* v. *The State*, 6 Texas Ct. App. 97.

Admission of the confessions of defendant in evidence is also complained of, but there is nothing to indicate that they were not freely and voluntarily made, and it is not

attempted to be shown that defendant was under arrest at the time.    Rev. Code Cr. Proc., arts. 749, 750.

Nor did the court err in admitting the evidence disclosed in the third bill of exceptions.    The witness was asked with reference to three spots of blood which he had seen on the top rail of the fence at the place of ingress and egress to defendant's yard, the question propounded being, "How did those bloody spots appear to have been made?"    The witness testified that they appeared to have been made with a hand.    We can see no good reason for excluding the evidence, nor can we imagine how the fact that the witness was asked and stated how the matter appeared to him affects its admissibility; for in testifying to such physical facts a witness cannot well testify otherwise than as to appearances, and the impressions created upon his mind from the appearances as to the causes producing them.

Another supposed error is that the verdict of the jury was received and entered during the absence of the counsel of defendant.    Whilst our Code of Procedure requires the presence of the defendant at the reception of the verdict in all felony cases (Rev. Code Cr. Proc., art. 711), there is no similar rule provided with regard to counsel; and the rule is, on the other hand, that it is not error to receive the verdict in the absence of defendant's counsel, the defendant himself (as was the case in this instance) being present and suffering no prejudice.    *Beaumont* v. *The State*, 1 Texas Ct. App. 533; *Summers* v. *The State*, 5 Texas Ct. App. 365.

Several objections are urged to the charge of the court; and in our opinion, after defining murder of the first and second degree and manslaughter, it does not present the law applicable to other phases of the case as made by the evidence in as clear, terse, and pointed a manner as would enable a jury of ordinary understanding to fully grasp and comprehend it.    Besides this, it submitted issues not raised, as far as we can see from this record, by the testimony ad-

duced on the trial.   And again, upon the two main features of the defence, viz., self-defence and justifiable homicide in defence of one's habitation, the law is more favorable to the accused than as it is found enunciated in the charge.

There is no positive rule for the definition of justifiable homicide.   It must depend upon the circumstances and surroundings of each particular case, and a mere declaration or enunciation of the rules prescribed in the statute will in many instances fall short of filling the measure of the law as it has been interpreted and thoroughly established by precedents and authority of long and recognized standing.   A defendant is always justifiable in acting for his defence, or the defence of his family or property, according to the circumstances as they reasonably appear to him, and it is but just and right that his action should be judged of in the light of the circumstances as they appeared to him at the time.   Such is our understanding of the law, and such the rule of decision in this State.   It is not necessary that there should have been actual danger, provided the party acted on a reasonable apprehension of danger.   *Munden* v. *The State*, 37 Texas, 353; *Horbach* v. *The State*, 43 Texas, 242; *Cheek* v. *The State*, 4 Texas Ct. App. 444; *Blake* v. *The State*, 3 Texas Ct. App. 581; *May* v. *The State*, 6 Texas Ct. App. 191; *Marnoch* v. *The State*, decided at the present term, *ante*, p. 269.

Defence of one's habitation is a right only limited in extent by the same rules which govern in the defence of the person.   If we recur to the common law, we will find that even there a party committing homicide while defending his dwelling-house against an assault, actual and positive, was held guilty of no higher grade of homicide than manslaughter.   1 Hale's P. C. 485, 486; East's P. C. 287, 321; Hawk. P. C. 83.

In *Mead's Case*, 1 Lew. C. C. 184, Holroyd, J., said that "a civil trespass will not excuse the firing of a pistol at a trespasser in sudden resentment or in anger.   If a person takes forcible possession of another's close, so as to be

guilty of a breach of the peace, it is more than a trespass. So if a man with force invades and enters the dwelling of another. But a man is not authorized to fire a pistol on every invasion or intrusion of his house. He ought, if he has a reasonable opportunity, to endeavor to remove him without having recourse to the last extremity. But the making of an attack upon a man's dwelling, and especially in the night, the law regards as equivalent to an assault upon a man's person; for a man's house is his castle, and therefore in the eye of the law it is equivalent to an assault."

It seems to us that the conclusion reached by the Supreme Court of Alabama in the well-considered case of *Carroll* v. *The State* is a most clear and forcible declaration of the correct rule by which to determine how far a person is protected in the defence of his dwelling. Goldthwaite, J., delivering the opinion, says: " It is conceded most fully that if the evidence shows an assault upon the house or the person, under circumstances which would create a reasonable apprehension — that is, a just apprehension — in the mind of a reasonable man of the design to commit a felony with force, or to inflict a personal injury which might result in loss of life or great bodily harm, the danger of the design being carried into execution being imminent and present, the person in whose mind such an apprehension is induced, or over whose person or property such danger is impending, may lawfully act upon appearances, and kill the assailant. The law would not in such a case require that the danger should be real, that the peril should actually exist, but it does require that the appearances shall be such as would excite a reasonable apprehension of such peril; and if such appearances do not exist, the killing would be either murder or manslaughter." 23 Ala. 28; Hor. & Thomp. on Self-Defence, 804. The same doctrine is held in *Pond* v. *The People*, 8 Mich. 150; Hor. & Thomp. on Self-Defence, 814.

The second special instruction asked for defendant in the

case we are considering was the law as far as it went, and should have been given, or, in lieu thereof, a charge submitting the law as it is above laid down. .

Because the charge of the court did not sufficiently present the law applicable to the case on the principal issue made by the defence, the judgment is reversed, and the cause remanded for a new trial.

*Reversed and remanded.*