40    71
44    168
40    71
73    71

JENNIE BECK by her next Friend, OLIVER BECK, Respondent, v. ELIJAH B. DOWELL, Executor of Estate of ZACHARIAH HARRIS, Deceased, Appellant.

## St. Louis Court of Appeals, March 18, 1890.

1. **Actions for Personal Injuries:** DEATH OF DEFENDANT. An action for injuries to the person abates on the death of the defendant, but, if the death occur after judgment against the defendant, the judgment is valid until reversed, and an appeal therefrom is properly taken in the name of the defendant's executor.

2. **Pleading:** MITIGATION OF DAMAGES. In actions for personal injuries evidence in mitigation of damages is admissible under a general denial.

3. **Damages:** EVIDENCE OF PLAINTIFF'S PECUNIARY CONDITION. When a case warrants exemplary damages, evidence of the pecuniary condition of the plaintiff, and of the plaintiff's family, is admissible ; and the admission thereof is not error, if the evidence in the cause at the time would have authorized the assessment of such damages by the jury.

4. **Practice, Appellate:** NON-PREJUDICIAL ERROR. The admission by the trial court of evidence establishing merely a state of fact, which the law would have presumed in the absence of evidence, *held* not prejudicial.

5. ———: EXCESSIVE VERDICT. A verdict for seven hundred and fifty dollars *held* not excessive as compensatory damages for a painful flesh wound through the thigh, made by a pistol shot.

*Per Biggs, J., dissenting:*

6. **Damages:** EVIDENCE OF PECUNIARY CONDITION OF PLAINTIFF AND FAMILY. In an action for personal injuries, evidence of the pecuniary condition of the plaintiff or of her family is inadmissible, even when the facts of the case are such as to warrant exemplary damages.

7. **Practice, Appellate :** PREJUDICIAL ERROR. Error in the admission of such evidence against proper objection is prejudicial, even though other evidence properly admitted in the cause may have led to a surmise of the state of the plaintiff's pecuniary condition. Error is presumed to have been prejudicial unless the contrary appear from the record.

8. **Practice, Trial**: SAVING EXCEPTIONS. *Semble*, that the mere failure of a party to expressly save an exception to an adverse ruling should not debar such party from assigning error of such ruling; an exception should be presumed.

9. **Evidence**: RES GESTÆ. Evidence of the acts of a person who was not a party to the suit held admissible as part of the *res gestæ*.

*Appeal from the Lewis Circuit Court.*—HON. BEN. E. TURNER, Judge.

AFFIRMED (*and transferred to Supreme Court*).

*Blair & Marchand* and *M. McKeag*, for the appellant.

(1) The court erred in sustaining the plaintiff's motion to strike out part of defendant's answer, if the matter stricken out tendered any defense, in whole or in part, to the action or any part of the action. *Justice v. Town of Lancaster*, 20 Mo. App. 559; *Kerr v. Simmons*, 82 Mo. 269. (2) The matters pleaded were largely mitigating circumstances and justifications for the shooting, and it was necessary to plead them. *Buckley v. Knapp*, 48 Mo. 152; *Deenhart v. Schmidt*, 7 Mo. App. 117; *White v. Maxey*, 64 Mo. 552. (3) The admission of evidence as to the wealth of the defendant was improper. There was nothing in the evidence to show that the acts of Harris were either wanton or malicious. and done intentionally without just cause. Plaintiff was entitled to recover, if at all, only compensatory damages; hence the court should have sustained. the objection to the evidence as to the defendant's wealth, and undoubtedly as to plaintiff's wealth, as being incompetent. *Frantz v. Hilterbrandt*, 45 Mo. 121; *Engle v. Jones*, 51 Mo. 316; *Brown v. Cape Girardeau*, 89 Mo. 152.

*Clay & Ray*, *F. S. Schofield* and *John C. Anderson*, for the respondent.

(1) We insist that the court committed no error in striking out portion of the defendant's answer. The matters and things therein alleged, if admissible in evidence at all, were admissible either under a general denial, or plea of justification, and in fact were admitted. *Nichols v. Winfrey*, 79 Mo. 544, 549 ; *Joice v. Branson*, 73 Mo. 28 ; *Sparling v. Conway*, 75 Mo. 510 ; 2 Greenl. Ev. [3 Ed.] sec. 93. Matters in mitigation of damages cannot, or at least ought not to, be pleaded except in the actions of libel and slander. *Rosenthal v. Brush*, 1 Code Rep. (N. S.) 228 ; *Travis v. Barger*, 24 Barb. 614. But, even if the court committed an error in sustaining the motion to strike out, all the matters alleged were admitted in the evidence. The defendant had the benefit of them. He sustained no injury and cannot now complain. (2) The court committed no error in admitting evidence to show the financial condition of plaintiff, her father and mother, and of defendant. *Clements v. Maloney*, 55 Mo. 352 ; *Daily v. Huston*, 58 Mo. 361 ; *Kennedy v. Holladay*, 25 Mo. App. 511 ; *Polston v. See*, 54 Mo. 294 ; *Buckley v. Knapp*, 48 Mo. 162 ; *Renfro v. Frior*, 22 Mo. 409.

ROMBAUER. P. J., delivered the opinion of the court.

The plaintiff is a minor, and she prosecutes this suit by Oliver Beck as next friend. The defendant has died since the trial, and his executor has been substituted as a party. The case, therefore, is in this condition: The executor properly prosecutes this appeal, because, under our code of practice, appeals perform merely the functions of writs of error, and the validity of the judgment, and not of the original claim, is the subject of inquiry. *Lewis v. Railroad*, 59 Mo. 495. But, if the judgment is reversed, the plaintiff is remitted to her

original claim, and, as that claim is one for injuries to her person, it is lost forever. R. S. 1879, secs. 96, 97; *Stanley v. Bircher*, 78 Mo. 247.

Under such circumstances, it is incumbent upon us to scrutinize the record very carefully to determine whether any error, which may have intervened in the trial of the cause, was clearly prejudicial to the appellant. If we are satisfied that such intervening error has materially affected either the right or extent of the recovery, the mere fact, that a reversal of the judgment debars the plaintiff from all redress, should not prevent us from reversing it. On the other hand, if we are not thus satisfied, we should not, for the sake of vindicating technical precision, sacrifice substantial justice.

The plaintiff averred in her petition that the defendant Zachariah Harris without just cause or provocation, but wickedly and maliciously, wounded and injured her with a leaden bullet, shot or discharged from a pistol, and that the wound thus inflicted caused a permanent injury, and also caused her great physical and mental suffering.

The defendant's answer contained : *First.* A general denial. *Second.* A plea of justification. *Third.* Facts and circumstances in mitigation of damages.

The cause was tried by a jury, and a verdict for seven hundred and fifty dollars against the defendant was returned into court, and judgment was entered accordingly.

All instructions given and refused by the court have been lost, and, in passing on the case, we are necessarily confined to the examination of errors arising out of the admission or rejection of evidence, and the action of the court in respect of the sufficiency of the pleadings.

I. The first error assigned by the defendant, and to which our attention has been directed by counsel, is the order of the court sustaining a motion to strike out

a portion of the defendant's answer.    The portion of the answer objected to, and which was stricken out by the court, contained a detailed statement of the circumstances under which the assault was made, and, if true, had a tendency to prove that the act complained of was justifiable, or, at least, was not wanton or malicious in its character.

The action of the court in striking out this portion of the answer cannot be held to be error.    In actions for personal injuries, evidence in mitigation of damages may be given under a general denial.    Boone on Code Pleading, sec. 76 ; *Hays v. Berryman*, 6 Bosw. 679 ; *Smith v. Lisher*, 23 Ind. 500.    This was the rule at common law (2 Greenleaf on Evidence [14 Ed.] sec. 93), and it has not been changed by our code of civil procedure.    It is only in actions for slander or libel that mitigating circumstances may be set forth in the answer. R. S. 1879, sec. 3553.

But, aside from this, it appears that the defendant was not prejudiced by this action of the court, since he was permitted on the trial to show the mitigating circumstances relied on by him.    We will have to rule this assignment against the defendant.

II.    The only other errors assigned relate to the action of the court in admitting and rejecting testimony, and to its action in refusing to set aside the verdict, which the defendant claims is excessive and the result of prejudice.

As above stated, there are no instructions preserved in the record, and we must, therefore, assume that the court correctly instructed the jury on all issues properly raised by the evidence.    It is elementary that, where the record is silent, all admissible presumptions must be made in support of the action of the trial court. We must further keep in view that, in determining the correctness of the rulings of the trial court on the evidence, we must take the state of the evidence when the

rulings were made, and, for the purpose of determining whether the verdict is supported by the evidence, we must consider the plaintiff's evidence alone, as the question of the weight of evidence, and credibility of witnesses, are questions for the jury, and not for us.

The plaintiff's evidence tended to show the following facts : The decedent was a farmer, and the plaintiff's father was his tenant occupying a portion of the farm. Upon the farm there was a pond fenced in a lot, known as the pond lot, at which pond the plaintiff's father had been in the habit of watering his stock up to the time of the difficulty hereinafter mentioned. On the day preceding the difficulty, the decedent forbade the plaintiff's father to water his stock at the pond, and his son drove back some stock which was attempted to be watered. On the day of the difficulty, the plaintiff's father, with the assistance of members of his family, including plaintiff, and with the aid of two other men, tried to take a cow by force to the pond to have her watered, and the decedent and his son resisted the attempt by force. In the scuffle which ensued, the decedent's son, with a club or part of a wagon shaft, felled the plaintiff's father and brother to the ground, and then ran, being pursued by the plaintiff's father and brother. The decedent, who was on the ground with a pistol strapped around his waist, then fired one shot at the plaintiff's father and brother, and then turned around and fired two additional shots at the plaintiff and her mother, who were standing behind him and about fifteen feet distant, the second of such shots taking effect in plaintiff's thigh and causing the injury sued for. As far as the plaintiff's evidence tended to show, and, in fact, as far as all the evidence went, *no personal violence was offered to the decedent prior to his beginning to fire, nor was any violence done him, until after he had shot the plaintiff*, nor was there any evidence, when the testimony hereinafter

mentioned was admitted, as to whether plaintiff's father had a legal right to water his stock in the pond, the only evidence on that subject, up to that time, being that the plaintiff's father had prior to, and up to the preceding day, watered his stock there, and that the decedent forbade his doing so.

This being the state of the case, the court, against the defendant's objection, admitted evidence touching the financial condition of the plaintiff and her family, and the defendant properly saved his exception. The court, against a similar objection, admitted evidence touching the defendant's financial condition, to which action of the court the defendant saved no exception.

That in all cases, wherein the recovery of exemplary damages is justified, the defendant's financial condition may be given in evidence is not controverted. Exemplary damages are not given by way of compensation, but for the purpose of inflicting punishment on the defendant, and the defendant's ability to pay becomes a material inquiry. Strange to say this doctrine finds no application whatever in criminal procedure, but is confined strictly to civil procedure possessing criminal elements. With the logic of the rule we have nothing to do ; it suffices for us that the rule exists, and is unquestioned in this state. The defendant, however, claims that the plaintiff's financial condition, and that of members of her family, was wholly irrelevant to any issue, regardless of the question, whether or not the case was one for exemplary damages, and that the admission of such evidence was highly prejudicial to the defendant in enlisting the prejudices and sympathies of the jury in the behalf of the plaintiff. We concede that the admission of evidence touching plaintiff's financial condition in an action for injuries to the person is logically still less defensible than evidence of the defendant's financial condition; yet it has been expressly decided in *Dailey v. Houston*, 58 Mo. 368, that in such

an action "the condition in life of the plaintiffs and their pursuits and the nature of their business" might be considered by the jury in estimating the damages. That case has never been expressly overruled in this state, and, as it is a controlling decision of the supreme court on this subject, it is binding on us and the trial court alike. We have not overlooked the fact that in *Stephens v. Railroad*, 96 Mo. 214, the supreme court held that evidence as to the number of plaintiff's children is inadmissible in an action for injuries to his person, *when there is nothing in the case to justify the giving of exemplary damages*, and that proof of the plaintiff's financial condition was equally inadmissible in such cases; but the remark is carefully confined to cases where the action is one for compensatory damages only, and the case of *Dailey v. Houston* is not even alluded to.

Under these circumstances, we cannot put the trial court in the wrong for admitting this evidence because, when it was admitted, the facts of the case unquestionably justified the submission of the case to the jury, as one warranting exemplary damages. Beyond this, however, the following facts are entitled to consideration. It appeared *aliunde* from a mass of testimony, wholly unobjected to, that the plaintiff was a minor sixteen years old living with her parents, who had a large family of children, all engaged in work as tenants of the defendant in cultivating a small portion of his farm. The plaintiff presumptively had no financial condition, and the financial condition of her parents presumptively was of the humblest kind. That the court admitted evidence in aid of this presumption can at best be merely considered cumulative evidence, the admission of which, even if erroneous, would not justify the reversal of the judgment as for prejudicial error.

Almost every other objection of the defendant to the admission of evidence relates to the admission of evidence on cross-examination of defendant's witnesses,

and while much of the evidence thus admitted was irrelevant, its admission, considering the latitude which is permitted in the cross-examination of witnesses, could not even be considered error, much less prejudicial error.

The verdict, as above seen, was for seven hundred and fifty dollars. The testimony of the plaintiff tended to show that the wound was inflicted by a ball passing from a rifled revolver in a rotary motion through her thigh close to the femoral artery; that the wound, although only a flesh wound, was painful; that the plaintiff was in a critical condition for several days, and was confined to her bed for weeks, and that, even at the date of the trial, which was seven months after the wound was inflicted, she could not use her leg for any length of time without pain, and that the wound was still open and had not healed. The probability of a permanent or at least continuous injury was made by the evidence a proper element for the consideration of the jury. There is, therefore, nothing in the amount of the recovery, which would justify us in vacating the verdict on account of excess, even if the plaintiff were limited to strictly compensatory damages, as there is nothing to show that the amount awarded was excessive, as a mere compensation. On the other hand we cannot accede to the view which has been strongly pressed upon our consideration, that, in determining whether the case is one for exemplary damages, we ought to take into consideration what the defendant's testimony tended to show. The credibility of witnesses is a question for the jury and not for us, and before we can disregard the finding of the jury as one opposed to the weight of evidence, we must be at least clearly satisfied that it was the result of prejudice. If the defendant's possession was invaded, he was justified in using necessary force in repelling it, but we cannot see how that could possibly justify him in deliberately using a deadly

weapon on the mother and daughter, who, as all the testimony shows, were unarmed.

These views lead to an affirmance of the judgment, and, with the concurrence of Judge THOMPSON, it is affirmed. Judge BIGGS, who dissents, is of opinion that this decision is opposed to the decisions of the supreme court in *Overholt v. Vieths*, 93 Mo. 422, and *Stephens v. Railroad*, 96 Mo. 207. It is, therefore, ordered that the case be certified to the supreme court for final determination under section 6 of the amendment of the constitution relating to the judicial department.

BIGGS, J., delivered the following dissenting opinion.

I cannot agree to the disposition made of this appeal by my learned associates. I am of the opinion that the trial court committed prejudicial error in the admission of evidence, and that, for this reason, the judgment ought not to be upheld. The fact that the defendant is dead, and that a reversal of the judgment would abate the action, should receive no consideration in the determination of the legal questions presented by the record.

I. My colleagues are of the opinion that, in a personal injury case, it is competent for the plaintiff to show his financial condition, provided it is a case in which the law would authorize the assessment of exemplary damages. I cannot yield my consent to this proposition. To my mind the principle is illogical and indefensible.

In an action for personal injuries, when the facts show that the injury complained of was inflicted wantonly and under aggravating circumstances, the financial condition of the defendant may be shown. This is permitted, not with the view of benefiting the injured party by increasing the amount of his damages, but for the purpose of inflicting punishment on the defendant

by the award of exemplary damages, and of deterring others from a like violation of law. Under this view the financial condition of a defendant becomes a material question, for the reason that a judgment for exemplary damages in a given case might be entirely adequate as a punishment, if the defendant was a poor man, but would be absolutely inadequate, if the defendant was wealthy. But I am unable to conceive upon what principle of law the financial condition of the plaintiff can be made the proper subject of judicial inquiry. And I am at a much greater loss to know how this inquiry can be extended, as was done in this case, to the plaintiff's father and mother. Ought the fact, that the injured party is poor, furnish any good and sufficient reason why he should receive a larger sum as compensatory damages than he otherwise would be entitled to? There can be but one answer to this question, and concerning which all of us are agreed. But my associates insist that, under the decisions of the supreme court, if the facts in a personal injury case authorize an award of exemplary damages, then the financial condition of the plaintiff may be proved. For what purpose? It cannot be possible that a defendant should be more severely punished for assaulting a poor man than a rich one? And is the offense rendered more odious in the eye of the law, and more deserving of punishment, from the fact that the immediate relations of the party assaulted are also poor? This must be true, if my associates are right.

Nothing is offered in support of this strange doctrine, except the case of *Dailey v. Houston*, 58 Mo. 261. In the *Dailey case* the court in passing on an objection to an instruction incidentally remarked that, in estimating the damages in a personal injury case, the jury might take into consideration the pecuniary condition of the parties, but no argument was submitted in support of the ruling, and the court simply declared it

to be the law, citing the case of *Clements v. Maloney*, 55 Mo. 352, as authority for the proposition. The *Clements case* was an action for slander, and was no authority in an action for damages growing out of an assault. In a suit for slander the financial condition of the plaintiff may be inquired into and considered (*Polston v. See*, 54 Mo. 291), but the reasoning adopted by the court in support of the proposition is entirely inapplicable to actions for personal injuries. In the press and hurry of judicial work the court, in disposing of the *Dailey case*, evidently overlooked the distinction between the two classes of cases. However, if there were no other adjudication of the supreme court bearing on this question, I would be compelled to accept it as good law.

But I am of the opinion that this anomalous ruling has been repudiated by the more recent decisions of the court. In the case of *Overholt v. Vieths*, 93 Mo. 422, the court in discussing the question said: "During the examination of Mrs. Overholt, and after she had stated that she was the mother of the child, and a widow at the time of the accident; that she had one other child, a daughter, about fifteen years old; that she and her daughter did the housework; that she had no servant, and, at the time of the accident, she was engaged in housework, she was asked what her financial condition was; and, this being objected to by defendant as being immaterial, the objection was sustained and plaintiffs excepted. In view of what she had been allowed to state as to her condition in life, we are of the opinion that the objection was properly sustained. The court, in receiving her statements as to her circumstances and surroundings at the time the child was drowned, went as far as this court has gone in the case of *Winters v. Railroad*, 39 Mo. 468–475, and others to which we have been cited."

In the case of *Stephens v. Railroad*, 96 Mo. 207, the court said: "This evidence as to the number of his

(plaintiff's) children was incompetent. It could have no bearing on the case whatever, lest it be to increase the amount of damages. There is nothing in the case to justify the giving of exemplary damages, and the damages should be confined to compensation for the injuries sustained. *As well might proof be made of plaintiff's financial condition.* This we have held the plaintiff may not do, when the parent is suing for the death of a minor child. *Overholt v. Vieths,* 93 Mo. 422. Some countenance, it may be thought, is given for the admission of such evidence by what is said in *Conroy v. Iron Works,* 75 Mo. 652, and in *Winters v. Railroad,* 39 Mo. 475. In the case last cited, and upon which the other is based, the evidence as to the number of children had been withdrawn, and the remarks about the competency of the evidence were wholly unnecessary. Besides, there was no claim in that case, as here, that the damages were excessive."

The foregoing decisions indicate very clearly the mind of the supreme court, and I do not think that the majority of this court are justified in holding that the decisions quoted only modified the rule in *Dailey v. Houston,* so as to make it applicable to cases where exemplary damages are allowable. The language employed does not admit of any such limitation or restriction, and I cannot persuade myself that the court intended to declare any such doctrine. That the court would have expressly overruled *Dailey v. Houston,* if its attention had been called to it, admits of no doubt. It is a matter worthy of remark that the *Dailey case* has never been cited by counsel, or the supreme court, as authority on this question.

But the admission of this evidence is attempted to be justified because other evidence was admitted without objection that plaintiff's father was a renter, and that this was tantamount to proof that complainant was poor, and that, therefore, no harm was done. I cannot

agree to this. It is competent, in this class of cases to show the avocation or business of the complainant, especially where the physical injury is permanent. Such evidence is admissible on the score of compensatory damages only. And while such testimony may indirectly indicate the financial standing of the complainant, yet it goes to the jury in such a way as not to prejudice the defendant. But, when the court admitted, against the defendant's objection, direct proof of the complainant's poverty, and also of that of her immediate relatives, the jurors might well conclude that they ought to consider such facts in determining the plaintiff's right of recovery.

II.     The next assignment relates to the admission of evidence concerning the wealth of the defendant. The other judges are of the opinion that this objection is not available to the defendant, because the record fails to show that he saved an exception to this ruling. This is the rule, but at best it rests on very narrow and technical grounds, and should only be enforced when the adverse party insists on its application. It is the practice in the country, so far as my knowledge extends, to consider an exception saved to every adverse ruling of the court, and the failure to note an exception in the record would and ought to be regarded as a mere clerical omission. That was evidently the view taken of the question by the learned counsel representing the plaintiff, and this accounts for a failure on their part to make the point in this court.

As I have said before, such evidence would only be admissible in a case where the facts justified an award of exemplary damages. Our supreme court has declared that punitive damages are only authorized in personal injury cases, where the injury complained of was wantonly and cruelly inflicted in a spirit of hatred or ill will and without reasonable provocation. *Morgan v. Durfee*, 69 Mo. 469; *Clark v. Fairley*, 30 Mo. App. 335;

*McKeon v. Railroad,* 42 Mo. 80 ; *Frantz v. Hilterbrand,* 45 Mo. 123 ; *Whalen v. Church,* 62 Mo. 326 ; *Owen v. Brockschmidt,* 54 Mo. 285. In other words, the facts and circumstances in evidence must show that the injury was inflicted maliciously, that is, with that wanton recklessness and disregard of the lives and safety of others, which could only emanate from a wicked and depraved heart.

The proper solution of the question necessarily leads to a review and discussion of the main facts in evidence, touching the origin of the difficulty, and the conduct of the parties just prior to, and cotemporaneous with, the shooting.

The shooting of the plaintiff by the defendant grew out of a difficulty between the Beck and Harris families. The defendant was seventy-six years old, and had been in very bad health for several months previous to the difficulty. He, and his son Nicholas, aged sixteen, lived on a farm, belonging to him, in Lewis county. He had rented a portion of his farm to Oliver Beck, Sr., the plaintiff's father, who lived with his family in a tenant house situated on the premises. This family consisted of Beck, his wife and five children, viz.: George, William, Oliver, Jennie and Myrtie. George and William were grown men ; Jennie, the plaintiff, was sixteen years old ; Oliver, fourteen, and Myrtie, twelve.

This difficulty occurred in August, and at the time there was a great scarcity of stock water on the farm, and the defendant had been driving his cattle for water to the Fabius river, which was in the neighborhood of the farm. On that portion of the farm which the defendant occupied, and over which Oliver Beck had no control or right of entry, the defendant had a pond of water, in what was known as the pond lot. This lot was separated from the other enclosures by fences and gates. The water in this pond was kept by defendant for his

horse stock. On the morning preceding this difficulty, some of Beck's younger children had attempted to drive their father's cows through the defendant's premises, and into the pond lot, with the intention of watering them at the pond. They were prevented from doing so by the defendant. Previously to this, the defendant had declined to give Beck permission to water his cows at the pond, stating to him that he (defendant) drove his own cattle to the river, and that he wished to keep the water in the pond for his horses. The action of the defendant in forbidding the children to water the stock at the pond seems to have enraged their father, and, on the same day, he notified some of his confidential friends that he intended to water his cows at the pond, or he would have a "little war with defendant;" and he invited George and William Heinselman to accompany him home and remain all night, in order that they might witness the "battle" on the following morning. Oliver Beck and the defendant met in the morning, and Beck informed the defendant that he intended to water his cows at the pond, adding, "I'll take them down there, if I have to wade in blood up to my boots." The defendant replied: "You had better examine the law."

The defendant and his son both testified that, at the time when this conversation took place, George Beck had a revolver in his hand, Oliver Beck, Jr., had a horse pistol, and William Beck had a rifle. The defendant also testified that, at the time of the difficulty, which occurred shortly afterwards, Oliver Beck, Sr., struck him on the head with a slung shot. The plaintiff, her mother, her sister and her younger brother testified that their party had no pistols, but it is proper in this connection to state that neither the father nor two older brothers were called as witnesses. If Oliver Beck, Sr., had the right to water his stock at the pond, or if he and his party were not armed and did not

threaten to force their way over the defendant's land, and did not intend, if it became necessary to accomplish their unlawful purpose, to use deadly weapons, then Oliver Beck ought to have denied these things on the witness stand, and the plaintiff's case would then have been relieved of some very ugly features. It is useless to argue that the plaintiff's case ought not to be prejudiced by anything that her father and brothers might have said or done; there is too much evidence in the case tending to show that the plaintiff was cognizant of her father's intentions, and actually participated in his unlawful and forcible trespass upon the defendant's property.

Immediately after the talk between Oliver Beck, Sr., and old man Harris, the former marshalled his forces and proceeded to the lot where his cows were kept, for the purpose of executing his previous threat. His company consisted of himself, George Beck, Oliver Beck, Jr., Myrtie Beck, George Heinselman and William Heinselman. There was an intervening enclosure (belonging to defendant) between the cow lot used by Beck and the pond lot, and into this enclosure the Beck party forced a cow, in spite of the protests and efforts of the defendant. The animal was led by a rope to the gate leading into the pond lot, and at this point the Beck company was reinforced by the plaintiff and her mother, and the defendant by his son Nicholas. The latter hitched his horse to the fence near the gate, and attempted to prevent the other party from forcing the cow through the gate. While this was going on, the plaintiff made the horse break loose, by which the fence was torn down, and during a scuffle that ensued between plaintiff and Nicholas the cow was gotten over the fence, and some of the Beck crowd started with her toward the pond. Nicholas went along with the crowd, and, in his efforts to prevent them from getting the animal to the pond, he got into a fight with Oliver

Beck, Sr., and his son George.  The plaintiff, George Heinselman, Mrs. Beck, Oliver Beck, Jr., and the defendant were following in the rear.  This was the position of the parties when the real fight commenced.

The plaintiff's evidence tended to prove that Nicholas Harris struck at Myrtie ( who was on horseback ), with a stick, but missed her and hit the horse; that thereupon Oliver Beck and George Beck attacked him, both of whom he knocked down with the stick; that Nicholas then ran in the direction of his father with Oliver Beck and his son George in close pursuit; that, as they passed the defendant, the latter shot at or in the direction of Oliver and George; that, at the time this shot was fired, the plaintiff, her mother, the youngest boy and George Heinselman were standing immediately behind the defendant, and that he, after firing the first shot, turned and shot first at Mrs. Beck, and then at the plaintiff; that just as he fired the last shot, George Beck struck him with a club from behind, and knocked him down; that afterwards plaintiff's father knocked the defendant down and kicked him.  The plaintiff testified that she did nothing to cause the defendant to shoot her, and in this she was corroborated by her mother, and Oliver, her youngest brother. The plaintiff also swore that she took no active part in the difficulty, except that she made Nick's horse break away, and that she then helped to get the cow through the fence.

The defendant's testimony tended to prove that the entire Beck family were actively engaged in committing the trespass, and that, before the fight at the pond, there was a difficulty between plaintiff and Nicholas at the gate, where the plaintiff made the horse pull the fence down; that, at the time the plaintiff struck Nicholas with a club, and during the scuffle between them, the cow was gotten through into the pond lot; that, when the crowd arrived at or near the pond,

Myrtie undertook to run her horse over Nicholas, when he struck the animal on the nose with a stick; that immediately Oliver Beck, Sr., and his son George rushed at Nicholas; that the latter knocked both of them down with the club, and then ran in the direction of his father, with both of his assailants in close pursuit. The defendant testified that, when the parties passed him, the Becks were very close onto his son, and for the purpose of attracting their attention from the pursuit, he fired his pistol into the air, and that, just as he did so, he was struck two or three blows on the head, from behind; that he immediately turned and fired twice; that he recognized Mrs. Beck, Jennie, Ollie and Myrtie Beck standing near him, and that the plaintiff and her mother had clubs in their hands; that he did not see them strike him, but there was no one else near enough to strike him; that, as he fired the last shot, some one struck him from behind with a club and knocked him down; that he was again knocked down, .was beaten while he was down; and that Ollie Beck struck him on the head with a stone.

Cyrus Heinselman testified that the plaintiff told him, "that, if the wagon spoke she threw at Nicholas as he ran past her had gone a little lower, that she would have stopped him;" that the plaintiff and her mother told witness on the day of the difficulty that, while the defendant was firing at old man Beck and George, "they tapped him on the back to attract his attention so as he would not kill them." The testimony of this witness was contradicted by the plaintiff and Mrs. Beck. The statement, made by defendant as to the injuries received by him, was corroborated by the evidence of his physician.

The foregoing is a general statement of the main facts as I gather them from a voluminous record.

It must be admitted that the Beck family was guilty of a wilful, violent and premeditated trespass

upon defendant's property; and the evidence leads irresistibly to the conclusion that the plaintiff was an active participant in its commission. It may be conceded that, under the evidence, it was a question for the jury whether the defendant had used more force than was actually necessary in attempting to repel the trespass on his property, but I cannot imagine upon what theory the conduct of the defendant is to be regarded as so reprehensible as to call for the assessment of exemplary damages. It may be that the dangers surrounding the defendant were not so great as to afford a complete justification for his act, yet the evidence shows that the shot was fired under very exciting, and, to the defendant, exasperating circumstances. We must judge the defendant's act in the light of his surroundings. He was an old man and unable physically to offer effectual resistance to the attacks of his adversaries. Oliver Beck, Sr., had in effect informed him that, if he resisted the threatened trespass, he would take his life. The defendant had reason to believe that the male members of the Beck family were armed, and, in addition to this, they had called in George and William Heinselman to assist them in their unlawful undertaking.

Under such circumstances, can it be said that the defendant did not have reason to fear that the Becks would take his life, or would do him or his son great bodily harm; can we go so far as to hold that the defendant acted maliciously, and that this case is a proper one for exemplary damages? I think not. In the case of *Pond v. The People*, 8 Mich. 150, the court had occasion to discuss this identical question as follows: "And a very limited knowledge of human nature is sufficient to inform us that, when men combine to do an injury to the person or property of others, of such a nature as to involve excitement and provoke resistance, they are not likely to stop at half-way measures, or to scan closely the dividing lines between felonies and misdemeanors.

But when the act they meditate is in itself felonious, and of a violent character, it is manifest that strong measures will generally be required for their effectual suppression; and a man who defends himself, his family or his property, under such circumstances, is justified in making as complete a defense as is necessary."

In *Hinchcliffe's case*, 1 Lewin's Rep. 161, upon an indictment for manslaughter, it appeared that the deceased and his servant insisted on placing corn in the prisoner's barn, which she refused to allow. They exerted force and a scuffle ensued, in which the prisoner received a blow in the breast, whereupon she threw a stone at the deceased and he fell and was taken up dead. HOLROYD, J., said: "The case fails on two accounts, it is not proved that death was caused by the blow, and, if it had been, it appears that the deceased received it in an attempt to invade her barn against her will. She had a right to defend her barn, and to employ such force as was reasonably necessary for that purpose, and she is not answerable for any unfortunate accident that may have happened in so doing."

In the case of *Morgan v. Durfee, supra*, SHER-WOOD, J., said "Durfee had the unquestionable right to defend his office from ruthless intrusion, and his person against a battery then being inflicted, as well as threatened death. His right was, therefore, of a two-fold nature, defense of his habitation and defense of his person; and as coincident with that twofold right he was invested by the first law of nature with authority to employ all the means within his reach, all the energies under his control, which the apparent necessity demanded, to expel the unwelcome and turbulent intruder, and protect himself against the murderous intentions of a desperate and dangerous man."

Under these decisions how can it be maintained that the defendant ought to be punished for resisting this armed invasion of his premises? It may be true that

he was not fully justified in making use of the pistol, yet the act was done under very exciting and aggravating circumstances, and the law will, and ought at least to, so far excuse the act as to relieve the defendant from punishment by way of exemplary damages.

It may be said, that this testimony was admitted upon the theory that the facts, when fully developed, would show a case for exemplary damages, and that, if it should subsequently appear that there were no aggravating circumstances attending the act and conduct of the defendant in the infliction of the injury, then the evidence would be withdrawn, and that, in the absence of any instructions, it must be presumed that the court corrected the error by withdrawing the objectionable evidence from the consideration of the jury. All proper presumptions will be made in favor of the correctness of judgments of courts of record, and, when the record sent to an appellate court does not contain the instructions given and refused, the presumption will be that the court properly directed the jury; but such presumption must be limited to declarations of law applicable to the issues as made by the pleadings. If this limitation is not to prevail, then, in the absence of instructions, all objections in respect of the admission of incompetent evidence would go for nothing, for the very simple reason that the appellate courts would be authorized to assume that the trial courts finally corrected the errors by withdrawing the illegal evidence from the consideration of the jury.

As the admission of the evidence touching the financial condition of both plaintiff and defendant was erroneous, the only remaining question is, was the evidence prejudicial. The rule by which this question must be determined was stated by this court in *Clark v. Fairley*, 30 Mo. App. 335, as follows: "Error is presumed to be prejudicial. To justify an appellate court to affirm a judgment where error has intervened

in the trial, the burden is upon the party claiming the benefit of the judgment to satisfy the appellate court that the error was not prejudicial." There is nothing in the record to throw very much light on the subject. The amount of the judgment would seem to indicate that the plaintiff was not prejudiced on the score of damages by the admission of the evidence, but there is nothing to exclude the idea that the verdict might have been produced, as was said in the *Fairley case*, "more by sympathy for the unfortunate sufferer, and by proof of the fact that the defendant was able to pay without serious inconvenience to himself, than by proper regard for the evidence touching the cause of the accident, which alone must determine the defendant's liability."

If the plaintiff's right to recover compensatory damages were perfectly clear and free from doubt, then I could probably agree with my associates that the errors complained of were not prejudicial; but I am of the opinion that the weight of the evidence was with the defendant, and that the incompetent evidence turned the scale against him.

III. The defendant offered to prove that, immediately after he was knocked down, George Beck went to the barn where the defendant's son was concealed, and shot at him with a pistol. The court excluded the evidence, and the defendant's counsel assign this action of the court for error. This evidence was material as having a tendency to show that the Beck party was armed, and that they intended to make use of violent means to accomplish their unlawful purpose, and it was admissible as part of the *res gestæ*.

I am clearly of the opinion that the judgment in this case ought to be reversed, and that the decision of the majority of the court is contrary to the decisions of the supreme court in the case of *Overholt v. Vieths*, 93 Mo. 422, and *Stephens v. Railroad*, 96 Mo. 207.