**Lansing, Michigan**

# Opinion

Chief Justice:          Justices:
Robert P. Young, Jr.   Michael F. Cavanagh
                        Marilyn Kelly
                        Stephen J. Markman
                        Diane M. Hathaway
                        Mary Beth Kelly
                        Brian K. Zahra

FILED JULY 29, 2011

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                  No. 141752

DONALD C. RICHARDSON,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH

MARILYN KELLY, J.

      This case involves the use of deadly force, allegedly in self-defense. The Court heard oral argument on whether to grant leave to appeal.[1] We asked the parties whether the trial court was correct when it instructed the jury using CJI2d 7.16, which permits consideration of whether the defendant had a duty to retreat.[2]

---

[1] *People v Richardson*, 488 Mich 1055 (2011).

[2] See MCL 768.21c; *People v Riddle*, 467 Mich 116, 134, 141 n 30; 649 NW2d 30 (2002).

We hold that it was appropriate to use the standard jury instruction in this case. Defendant was on his porch during the altercation in question, so he had no duty to retreat. However, there was adequate evidence from which the jury could conclude that he did not need to use deadly force to defend himself. Rather than grant leave to appeal, we affirm defendant's convictions for assault with intent to commit great bodily harm less than murder and possession of a firearm during the commission of a felony (felony-firearm).

Defendant and his wife had a poor relationship with some of their neighbors, including the Moores, which resulted in several altercations predating the events involved in this case. On September 25, 2008, the son of Brandy Abrams, one of the victims, allied with other neighbors to hurl insults at defendant and his wife and throw rocks and eggs at their home. Defendant's wife responded in kind. At some point, she struck the Abrams boy in the chest, and someone called Brandy Abrams to inform her.

Brandy Abrams arrived at defendant's home about 15 minutes later. She battered the screen door of defendant's enclosed front porch with a baseball bat. She claimed that she did it in reaction to defendant's wife, who was ranting, raving, spitting at her, and threatening to "whoop my ass." Abrams acknowledged that she threatened to assault defendant's wife.

Defendant got his wife to step inside their home. He claimed that Abrams, bat in hand, next directed her threats against him. Defendant testified that a second person, Dennis Dinwiddie, then approached defendant's porch door in a threatening manner. Abrams and Dinwiddie contested that testimony and claimed instead that Dinwiddie

2

attempted to defuse the situation by taking Abrams by the arm and leading her back toward the Moores' house.

It is agreed that at this point defendant remonstrated that he was "getting tired of this shit," pulled out one of his three loaded handguns, and fired six times. Both Abrams and Dinwiddie were shot and injured, Abrams in her side, arm, and leg and Dinwiddie in his chest and posterior flank.

Defendant was charged with two counts of assault with intent to commit murder,[3] two counts of assault with intent to do great bodily harm less than murder,[4] two counts of felonious assault,[5] and one count of felony-firearm.[6] At trial, he asserted a theory of self-defense. At the close of trial, the court read CJI2d 7.16 to the jury. The portion of that instruction most pertinent to our analysis states:

> (1) A person can use deadly force in self-defense only where it is necessary to do so. If the defendant could have safely retreated but did not do so, you may consider that fact in deciding whether the defendant honestly and reasonably believed [he/she] needed to use deadly force in self-defense.

> (2) However, a person is never required to retreat if attacked in [his/her] own home, nor if the person reasonably believes that an attacker is about to use a deadly weapon, nor if the person is subject to a sudden, fierce, and violent attack. [CJI2d 7.16.]

---

[3] MCL 750.83.

[4] MCL 750.84.

[5] MCL 750.82.

[6] MCL 750.227b.

3

After one day's deliberations, the jurors sent a note to the judge asking for clarification of what constituted defendant's "home." The court explained that an individual has no duty to retreat before using deadly force if in his or her own home or in the curtilage of that dwelling. The court further explained that "curtilage" generally means land or a yard adjoining a house, usually within an enclosure.

Two days later, the jurors notified the court that they could not reach a decision. The court reinstructed them on self-defense, explaining that people "can actually be in their home, their dwelling and not be subject to self-defense unless those circumstances them self [sic] justify that." The court asked the jurors to continue deliberating and reread CJI2d 7.16, but it did not reinstruct them on the definition of "curtilage." Defendant objected to the refusal to reinstruct on curtilage but did not object to the jury instructions in any other way or at any other point.

At oral argument in this Court, defense counsel contended that the trial court erred by giving CJI2d 7.16. Counsel asserted that the court should have instructed the jury that defendant had no duty to retreat because it was undisputed that he was in his home when attacked.

When this Court reviews jury instructions for reversible error, we consider the instructions as a whole.[7] In this case, although the jury was told that there is a general duty to retreat, that instruction was immediately followed by the word "however." This qualifier informed the jury that an exception to that general rule would follow. Then, the

---

[7] *People v Kelly*, 423 Mich 261, 270-272; 378 NW2d 365 (1985).

4

trial court instructed the jury that there is never a duty to retreat when attacked in one's home.

The trial court's instructions tracked CJI2d 7.16 almost verbatim. While "[t]rial judges should not hesitate to modify or disregard the [criminal jury instructions] when presented with a clearer or more accurate instruction,"[8] in this case defense counsel requested no alternative instruction. We cannot agree with defendant's position, which would require trial courts to sua sponte depart from the criminal jury instructions under circumstances such as those presented here.

At trial, the prosecutor never argued that defendant was required to, or even should have, retreated from the altercation. In attempting to rebut defendant's self-defense claim, the prosecutor argued only that defendant could not establish that he honestly and reasonably believed that he needed to use deadly force.

We conclude that defendant has not established that it was plain error for the court to instruct the jury using CJI2d 7.16. The instruction correctly told the jurors that, if defendant was in his home, he did not have to retreat. It also correctly informed them that defendant was entitled to use deadly force in self-defense only if it was necessary to do so.

It is apparent that the jury concluded that deadly force was not necessary and that the facts support that conclusion. An instruction that omitted the general duty to retreat and informed the jury only that defendant had no duty to retreat might have been clearer. However, defense counsel did not ask the court to give such an instruction. And

_____

[8] *People v Dykhouse*, 418 Mich 488, 494 n 1; 345 NW2d 150 (1984).

5

defendant was not prejudiced by this omission because the jury was, in fact, informed that a person attacked in his or her home has no duty to retreat. It was also instructed that a person's porch is considered part of his or her home.

The dissent raises several points warranting a response. We wholeheartedly agree with the dissent that the castle doctrine and the right of personal self-defense are longstanding and precious rights that we must vigorously uphold. But this case jeopardizes neither. The factual dispute was whether defendant honestly and reasonably believed that he was entitled to use deadly force.[9] The court correctly instructed the jury that defendant had no duty to retreat if attacked in his home. Once the trial court clarified that the porch was part of defendant's home, the jury instructions removed any remaining questions about whether defendant had a duty to retreat.

We further agree with the dissent that had the jury not been instructed that a person has no duty to retreat when attacked in his or her home, reversal would have been

---

[9] The dissent correctly asserts that there was record support for defendant's self-defense claim. By the same token, there was abundant evidence from which the jury could and did conclude that defendant's use of deadly force was not necessary. For example, (1) defendant and his wife had had an acrimonious relationship with their neighbors and a number of altercations with them in the past, (2) immediately before he shot the victims, defendant exclaimed that he was "getting tired of this shit," (3) a neighbor corroborated Dinwiddie's testimony that Dinwiddie was leading Abrams away from defendant's house when defendant shot them and testified that Dinwiddie and Abrams had reached the Moores' property when defendant opened fire, (4) a medical report indicated that one bullet likely struck Dinwiddie in the rear flank, (5) it is uncontested that defendant's wife was in no danger of physical harm when defendant opened fire, (6) there was no allegation that Dinwiddie or Abrams was assaulting defendant when he shot them, (7) neither Dinwiddie nor Abrams was carrying a firearm or knife, and (8) it is uncontested that defendant was unharmed when he opened fire. The jury had all the evidence it needed to conclude that defendant emptied his gun into two defenseless and retreating victims.

6

required.  Our decision in *Pond v People*[10] and 150 years of subsequent caselaw clearly mandate such a result.

But nothing in that caselaw required the judge in this case to sua sponte give the jury an instruction not to let the fact that defendant did not retreat into his house enter its deliberations.[11]  *People v Riddle* addressed this question in a footnote in dictum.[12]  But we do not agree that the footnote mandates reversal in the instant case.

As noted, the success of defendant's self-defense claim did not hinge on whether he was required to retreat or stand his ground on his porch.  Rather, it hinged on whether he honestly and reasonably believed that it was necessary to use deadly force while standing his ground.[13]  After being properly informed that defendant had no duty to retreat if attacked in his home, the jury concluded that deadly force was not necessary.  It recognized that the evidence showed that defendant was unharmed and could have

---

[10] *Pond v People*, 8 Mich 150 (1860).

[11] It is this simple legal truth that renders untenable the dissent's claim that such an instruction would have been "the only proper instruction" under the facts of this case. *Post* at 16.

[12] *Riddle*, 467 Mich at 141 n 30 ("There might be circumstances in which an instruction permitting the jury to consider a defendant's failure to retreat would be improper; for instance, if the defendant was inside his dwelling when he was attacked or if the undisputed evidence established that he was suddenly and violently attacked.").  Because we concluded that the defendant in *Riddle* was not in his dwelling when he was attacked, this footnote was not necessary to *Riddle*'s holding and is obiter dictum.

[13] We see nothing in the record to support the dissent's speculation that the jurors rejected defendant's self-defense claim in the belief that he should have retreated.  It bears repeating that the prosecutor never argued that defendant should have retreated.

continued to stand his ground and remain unharmed without shooting the victims. The dissent makes the right arguments in the wrong case.

Finally, we do not agree with the dissent that it is "undisputed" that the jury considered whether defendant should have retreated rather than use deadly force.[14] The dissent asserts that, because the jury asked for clarification of what constituted defendant's "home," it must have considered defendant's failure to retreat. On the contrary, the jury was likely trying to determine whether the duty to retreat applied to defendant. Hence, in a note to the judge, it asked for clarification about whether defendant was in his home when standing on his porch. Once the judge clarified this point, the jury could determine that defendant had no duty to retreat and direct its attention, appropriately, to whether it was necessary for him to use deadly force. The note was sent *before* the judge clarified the meaning of "home." Hence, the dissent has no basis to conclude that the note proves that *after* the judge responded, the jury believed defendant had a duty to retreat.

We reject defendant's remaining claims of error for the reasons stated in the Court of Appeals' opinion. We reject his claim that trial counsel was ineffective for failing to call Dinwiddie's treating physician because defendant did not demonstrate that counsel's

---

[14] *Post* at 19 n 7.

8

actions were anything other than reasonable trial strategy.[15]  Therefore, we affirm defendant's convictions.

> Marilyn Kelly
> Robert P. Young, Jr.
> Michael F. Cavanagh
> Diane M. Hathaway
> Brian K. Zahra

---

[15] This issue was raised for the first time in this Court, so the Court of Appeals did not address it.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                          No. 141752

DONALD C. RICHARDSON,

      Defendant-Appellant.

_____

MARKMAN, J. (*dissenting*).

Sixty-year-old defendant Donald Richardson, living at the same home in Detroit for more than 34 years with no prior criminal record, is currently serving a 5½-year minimum prison sentence for shooting two people who, while under the influence of drugs and alcohol, came to his home after violent words had been exchanged and approached him on his front porch wielding a baseball bat. From his first encounter with the police to his appeal in this Court, he has consistently claimed that he acted in defense of himself and his family.

On these facts, defendant's claim of self-defense is neither surprising nor difficult to understand. By their communications to the trial court, many people living in his community certainly understood it, as, I believe, would many people who can imagine themselves in defendant's circumstances. However, his self-defense claim was not properly understood by the trial court and was not properly presented to the jury. Specifically, the trial court repeatedly told defendant's jury that retreat *could* be a factor

in determining whether his use of force was necessary. This instruction was contrary to the common-law castle doctrine, which derives from this Court's seminal self-defense case, *Pond v People*, 8 Mich 150 (1860), which was recently reaffirmed in *People v Riddle*, 467 Mich 116, 134-135; 649 NW2d 30 (2002), and commands that there is no duty to retreat when a person is attacked in his or her own home. Moreover, defendant's jury was given inconsistent and unnecessarily complicated guidance on what constitutes the "home" for purposes of self-defense. Simply put, despite this Court's explicit and crystal-clear pronouncements concerning the law of self-defense and retreat, the jury was never told that under the circumstances of this case, retreat could *not* constitute a factor in its deliberations because, on the undisputed facts, defendant as a matter of law had no duty to retreat. As a result of the court's failure to give this instruction, it is equally undisputed that the jury did, in fact, consider retreat in its deliberations.

Today, a majority of this Court concludes that the failure to give this simple instruction required by Michigan law was not in error because the instructions given, taken as a whole, were essentially "good enough." Because this holding is contrary to both *Pond* and *Riddle*; because this Court must continue to speak strongly and clearly on the right of self-defense, particularly with regard to the sometimes difficult and insecure environments of some of our state's largest cities; and because the instructional error here was far from harmless, implicating a quintessential right of a free society, on which the Second Amendment of our Constitution is predicated-- the right of personal self-defense-- I respectfully, but very strongly, dissent.

2

## I.  FACTS AND PROCEEDINGS

The events leading up to the incident at defendant's home were disputed. Witnesses provided contradictory testimony, and some witnesses, especially the victims, changed their stories multiple times.   However, the pertinent facts can be fairly summarized as follows.  Defendant is a retiree who worked for the city of Detroit for 30 years, living at the same home in the city for 34 years.  During that time, defendant's neighborhood grew increasingly unstable, and security diminished further when new renters moved into the house next door.  These neighbors threw trash in the Richardsons' yard, vandalized their property, and verbally abused them.  The Richardsons' conflicts with the renters were well known to defendant's friends and fellow church members, who characterized the neighbors' behavior as "harassment [that] was nonstop."  In one incident, people throwing rocks broke a window of defendant's home.  In another incident, which occurred a week before the shooting, relatives of the neighbors came into defendant's yard with a baseball bat.  Defendant contacted the police, but received no response.   According to defendant, he and his wife had repeatedly sought police protection from this kind of activity, but "didn't get any action," so he had contacted the county prosecutor, the Attorney General, the state police, and the Governor concerning what he viewed as the diminishing level of security in his neighborhood.

On September 25, 2008, defendant's wife, a 60-year-old homemaker and grandmother, had a confrontation with neighborhood children.  Afterward, the mother of one of the children, Brandy Abrams, came to defendant's home swinging a baseball bat. Defendant testified that she hit him in the chest with the bat.  Abrams denied this, but admitted that she had hit defendant's screen door and porch rail.  Another friend of the

3

neighbors, Dennis Dinwiddie, followed Abrams to defendant's home. Defendant and his wife claimed that Abrams and Dinwiddie both threatened them, although Dinwiddie claimed that he was trying to retrieve Abrams and defuse the situation.

At some point, defendant, who possessed a license to carry a concealed weapon, pulled out his lawfully registered firearm and shot at Abrams and Dinwiddie. At the time of the shooting, defendant was on his porch, and his wife was inside the house with their nine- and two-year-old grandchildren. Although Abrams and Dinwiddie provided varying testimony regarding exactly where they were standing, there is no question that they were in defendant's yard, if not on his front porch or front porch steps. Defendant then reloaded his weapon and waited on the front porch for the police to come. Abrams sustained wounds to her arm, leg, and side, and Dinwiddie sustained wounds to his chest and posterior flank. A medical report suggested that the wound to his posterior flank was an exit wound, but Dinwiddie testified that he had been shot in the back. Testing at the hospital revealed high levels of marijuana, opiates, and alcohol in the victims' blood.

Defendant was charged with assault with intent to commit murder, MCL 750.83; assault with intent to do great bodily harm less than murder, MCL 750.84; felonious assault, MCL 750.82; and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. After deliberating for three days and being deadlocked at one point, the jury convicted him of two counts of assault with intent to do great bodily harm less than murder and one count of felony-firearm. At sentencing, the prosecutor requested an upward departure from the recommended minimum sentence range. Many of defendant's neighbors and fellow church members wrote to the trial court on defendant's behalf requesting leniency. The portrait of defendant gleaned from these

4

letters is that of a law-abiding citizen who was an active member of his church and community for many years. The trial court sentenced defendant within the guidelines recommendation to 36 to 120 months in prison for each assault conviction, to be served consecutively to the two-year sentence for felony-firearm.

Defendant appealed in the Court of Appeals and also filed a motion for bond pending appeal. In his motion for bond, he emphasized his age, his lack of a criminal record, and his family's reliance on him, financial and otherwise, explaining that over the duration of the criminal proceedings, he had lost his home, his vehicles, and his savings and was no longer able to support his wife on his fixed income. This motion was denied by the Court of Appeals, as well as by this Court, over my dissent. *People v Richardson*, 485 Mich 1044 (2010). The Court of Appeals then considered defendant's appeal on the merits and affirmed. *People v Richardson*, unpublished opinion per curiam of the Court of Appeals, issued July 27, 2010 (Docket No. 291617). This Court directed that oral argument be heard on whether to grant the application for leave to appeal, *People v Richardson*, 488 Mich 1054 (2011), and argument was heard on May 10, 2011.

## II. STANDARD OF REVIEW

This Court reviews de novo claims of instructional error involving a question of law. *People v Dupree*, 486 Mich 693, 702; 788 NW2d 399 (2010).

## III. ANALYSIS

### A. SELF-DEFENSE & RETREAT

Michigan's seminal self-defense case, *Pond v People* in 1860, provided an enduring statement of the limits and the purpose of the right of self-defense:

5

Human life is not to be lightly disregarded, and the law will not permit it to be destroyed unless upon urgent occasion. But the rules which make it excusable or justifiable to destroy it under some circumstances, are really meant to insure its general protection. They are designed to prevent reckless and wicked men from assailing peaceable members of society, by exposing them to the danger of fatal resistance at the hands of those whom they wantonly attack, and put in peril or fear of great injury or death. And such rules, in order to be of any value, must be in some reasonable degree accommodated to human character and necessity. They should not be allowed to entrap or mislead those whose misfortunes compel a resort to them. [*Pond*, 8 Mich at 173.]

In *Pond*, the defendant shot and killed Isaac Blanchard, a fellow commercial fisherman in the village of Seul Choix Point who had repeatedly harassed and threatened Pond, his family, and employees and had damaged his property.[1] Blanchard's abuse culminated when he and two accomplices came to Pond's home intoxicated and asked to search the house for him. When Pond's wife refused, the group began tearing down an outbuilding and choking an employee, acts that terrorized Pond's wife and small children. Pond heard the commotion and came out of his home armed with the shotgun with which he shot Blanchard. *Id*. at 159-161. After the shooting, he took "immediate steps to surrender himself to justice." *Id*. at 181.

At Pond's trial, the judge did not instruct the jury that there is no duty to retreat in one's home, and Pond was convicted of manslaughter. This Court reversed. The landmark decision articulated several rules of self-defense that have guided courts for

---

[1] The village at Seul Choix Point is east of what is now Manistique. For more details on the facts of *Pond*, as well as an enlightening discussion of the significance of the case in the jurisprudence of this state and the nation, see Peterson, *Pond v The People: Michigan Sets a Legal Precedent*, Michigan History, March/April 2011, at 37-41.

more than 150 years.[2]  First, the "necessity of taking life" must be judged by the circumstances as they appeared to the accused at the time of the attack.  *Id*. at 173-174. As *Pond* explained, viewing necessity from the perspective of the accused is the only way to ensure that the rules of self-defense do not "entrap or mislead those whose misfortunes compel a resort to them" and will serve the purpose for which they are designed: "to prevent reckless and wicked men from assailing peaceable members of society . . . ."  *Id*. at 173.  Second, *Pond* adopted the ancient common-law castle doctrine in Michigan, expressly holding that "[a] man is not . . . obliged to retreat if assaulted in his dwelling, but may use such means as are absolutely necessary to repel the assailant from his house, or to prevent his forcible entry, even to the taking of life."  *Id*. at 177.

These principles were reaffirmed in 2002 in *Riddle*:

> [T]he cardinal rule, applicable to all claims of self-defense, is that the killing of another person is justifiable homicide if, under all the circumstances, the defendant honestly and reasonably believes that he is in imminent danger of death or great bodily harm and that it is necessary for him to exercise deadly force.  [*Riddle*, 467 Mich at 142.]

"[T]he touchstone of any claim of self-defense . . . is *necessity*."  *Id.* at 127.  "As part and parcel of the 'necessity' requirement that inheres in every claim of lawful self-defense, evidence that a defendant could have safely avoided using deadly force is normally

---

[2] *Pond* has been cited favorably as a leading self-defense case by the United States Supreme Court in *Beard v United States*, 158 US 550; 15 S Ct 962; 39 L Ed 1086 (1895), and by the highest courts of at least 22 states.  See, e.g., *Crawford v State*, 231 Md 354; 190 A2d 538 (1963); *State v Couch*, 52 NM 127; 193 P2d 405 (1946); *Parrish v Commonwealth*, 81 Va 1 (1884), overruled in part by *Fortune v Commonwealth*, 133 Va 669; 112 SE 861 (1922); see also, Peterson, p 37 ("The court's landmark ruling [in *Pond*] established a precedent for the state and the nation.").

relevant in determining whether it was *reasonably necessary* for him to kill his assailant."
*Id.* at 142.  As a general rule, the duty to avoid using deadly force when safely possible requires consideration of whether a defendant could have safely retreated.  *Id.* at 127.

*Riddle* straightforwardly identified three circumstances in which the general duty to retreat has no relevance or application, including the exception applicable to the instant case, the castle doctrine.  Citing *Pond*, it specifically reaffirmed the doctrine as it had existed at common law for more than 150 years and stated-- in a boldface heading no less-- that "RETREAT IS NOT A FACTOR IN ONE'S DWELLING."  *Id*. at 134. Furthermore, in a passage that bears directly on this case, *Riddle* stated:

> There might be circumstances in which an instruction permitting the jury to consider a defendant's failure to retreat would be improper; for instance, if the defendant was inside his dwelling when he was attacked or if the undisputed evidence established that he was suddenly and violently attacked.  In such a case there would be no basis for an instruction allowing the defendant's failure to retreat to be considered in determining whether he acted in lawful self-defense.  [*Id*. at 141 n 30 (citation omitted).]

After examining the common-law castle doctrine, *Riddle* concluded that it was limited to "the dwelling and its attached appurtenances" and did not include the curtilage. *Id*. at 135. [3]  Specifically, *Riddle* held:

---

[3] This Court has defined "curtilage" as a "court-yard, back-side, or piece of ground lying near and belonging to a dwelling-house" and as "a space of ground within a common enclosure, belonging to a dwelling-house."  *People v Taylor*, 2 Mich 250, 251-252 (1851) (quotation marks and citations omitted); see also Black's Law Dictionary (9th ed) (defining "curtilage" as "[t]he land or yard adjoining a house, [usually] within an enclosure").  *Pond* determined that the outbuilding or "net-house" at which the defendant had exercised his right of self-defense was a "dwelling or a part of the dwelling . . . ." *Pond*, 8 Mich 181.  *Riddle* thus concluded that "[b]ecause the only indication we have of the castle doctrine as it applied in Michigan at the time of the codification of our murder statute is that it applied '*in the dwelling*,' we lack the authority to now extend this rule to areas beyond 'the dwelling' itself."  *Riddle*, 467 Mich at 136 (citation omitted).  In

8

> [W]hile the castle doctrine applies to all areas of a dwelling—be it a room within the building, a basement or attic, or an attached appurtenance such as a garage, *porch*, or deck—it does *not* apply to open areas in the curtilage that are not a part of a dwelling. [*Id.* at 138 (first emphasis added).]

Following our decision in *Riddle*, and in direct response, the Legislature enacted MCL 768.21c, which provides:

> (1) In cases in which [MCL 780.972] does not apply, the common law of this state applies except that the duty to retreat before using deadly force is not required if an individual is in his or her own dwelling or within the *curtilage* of that dwelling.
>
> (2) As used in this section, "dwelling" means a structure or shelter that is used permanently or temporarily as a place of abode, including an appurtenant structure attached to that structure or shelter. [Emphasis added.]

Accordingly, the statute extends the castle doctrine to include the curtilage of the dwelling, superseding the part of *Riddle* that held to the contrary. Thus, in accordance with *Pond*, *Riddle*, and MCL 768.21c, and at all times relevant to the instant case, when a person is attacked in his or her "dwelling,"[4] which undisputedly includes the "porch," "retreat is not a factor" to be considered in the jury's determination of whether a defendant's use of force was necessary. *Riddle*, 467 Mich at 134, 138, 141 n 30. To employ the emphatic presentation of *Riddle*, "RETREAT IS NOT A FACTOR IN ONE'S DWELLING." *Id*. at 134.

---

responding to *Riddle* with the enactment of MCL 768.21c, the Legislature labored under no similar stricture.

[4] The same is true, of course, with regard to the curtilage of that dwelling.

## B. INSTRUCTIONAL ERROR

In its initial charge to the jury on self-defense, the trial court read CJI2d 7.16, entitled "Duty to Retreat to Avoid Using Deadly Force." The court stated:

> [A] person can use deadly force and [sic] self-defense only where it is necessary to do so. If the Defendant could have safely retreated but did not do so, you may consider that fact in deciding whether the Defendant honestly and reasonably believed he needed to use deadly force and [sic] self-defense.
>
> However, a person is never required to retreat if attacked in his or her own home, nor if the person reasonably believed that the attacker is about to use a deadly weapon, nor if the person is subject to a sudden fear [sic] and violent attack.

Notably in this instruction, the jury was expressly told to consider whether "the Defendant could have safely retreated . . . ." Subsequently, in the qualifying statement that followed, which provided three exceptions to the general rule, the jury was told that there is no duty to retreat "in [one's] home."

After deliberating for a day, the jury sent a note asking:

> What is consider[ed] the defendants "home"? to understand <u>Self defense</u>?
>
> Need clarification—Can the Judge instruct us?

At this point, apparently for the first time during defendant's trial, the court became aware of MCL 768.21c. Defense counsel belatedly brought the statute to the court's attention and requested that the court instruct the jury on the meaning of "dwelling" and the definition of "curtilage." The court agreed and, relying on Black's Law Dictionary, responded to the jury's question accordingly:

> There is a definition, and we can just sort of put at rest just the home word right now. There is—the statute says that in cases of self-defense the

10

common law of this state applies except that the duty to retreat before using deadly force is not required if an individual is in her own home or dwelling or within the curtilage of that dwelling. And curtilage, as a general definition, meaning land or yard adjoining a house usually within an enclosure.

The court did not repeat CJI2d 7.16 at this point.

Two days later, the jury notified the court that it still could not reach a decision.

The court instructed the jury to continue deliberating and reinstructed on self-defense.

This time the court extemporized and added the following:

> The law in general says a person has the duty to retreat except in some circumstances. We talked about that the other day, about how if a person may be—we used the home, dwelling, curtilage and so forth. But understand again, someone can actually be in their home, their dwelling and not be subject to self-defense unless those circumstances themselves justify that.

> I want to make sure that no one is under the impression, some people that have that, if someone comes to someone's house or on their property and if they kill or use deadly force automatically that justifies and that's self-defense. The law is that you have to follow the rules of law and make an analysis as to whether or not those circumstances are such that fit or justify self-defense.

The court also reread CJI2d 7.16, but did not reinstruct on the definition of "curtilage." Defense counsel objected to this omission and requested that the trial court repeat the curtilage instruction, but the court declined to do so. Later that same day, the jury returned with a verdict of guilty.

In its review of the jury instructions, the Court of Appeals focused on the trial court's failure to consistently define "home" in the law of self-defense and its refusal to reinstruct on curtilage. Those errors, however, are secondary to the fundamental and most glaring instructional error that occurred at defendant's trial. That is, defendant's jury was never told that, on the undisputed facts of this case, defendant had no duty to

11

retreat as a matter of law and therefore that the jury was not permitted to consider retreat as a factor in its deliberations. Because defendant was on his porch and the victims were, at the very least, within his yard, there was no question that defendant was attacked in his dwelling or within the curtilage of that dwelling. See *Riddle*, 467 Mich at 138; MCL 768.21c(1). Thus, under both the common law and the statute, he had no duty to retreat, and pursuant to *Riddle*, the jury should have been clearly and straightforwardly told that it was not "permit[ed] . . . to consider" retreat in its determination of whether defendant's use of force was necessary. *Riddle*, 467 Mich at 141 n 30.

It is worth reflecting on why *Riddle* would offer this forceful direction concerning why merely "permitting the jury to consider" a defendant's failure to retreat would be improper in circumstances exactly like those in the instant case. *Id*. I suggest that, in part, this direction has to do with the very purpose of, and justification for, the castle doctrine. This justification is not hard to understand, and many classic formulations exist. As *Riddle* explained, "in a very real sense, a person's dwelling is his primary place of refuge. Where a person is in his 'castle,' there is simply *no safer place* to retreat." *Id*. at 135. Thus, when we consider the perspective of the defendant-- as is required in any self-defense case-- it is evident why the law affords special and particularly robust protection to the home, for what could be more frightening than to feel unsafe and powerless against an attacker in one's own home? Where could the use of force be felt more necessary? In addition, I believe that the reason *Riddle* spoke so emphatically on this subject was because it recognized that there would perpetually be the temptation to argue that a defendant *might* have retreated farther before exercising his right of self-defense, no matter what his venue in confronting an attacker. Why, after all, should the

12

fact that a defendant has retreated beyond some relatively artificial point-- i.e., curtilage, porch, home-- mitigate entirely a continuing obligation to retreat further if he could safely do so and thereby avoid inflicting harm on his attacker?  That is, there would always be a temptation for some jurors to focus on the continuity of the retreat, rather than on the 'discontinuity' of the proposition that at some defined point, retreat is no longer a relevant concept.  This temptation would have been all too present for the jurors in this case, given that defendant was on his porch and he could obviously have retreated into his house, just as his wife had already done.

In this way, the instant case illustrates well why *Riddle*'s strong and clear direction regarding the castle doctrine is warranted.  It also illustrates well why it is so important that this Court continue to speak strongly and clearly regarding the right of self-defense. "[T]he fundamental goal of a castle doctrine law is to preserve life by guaranteeing the vulnerable home dweller the right to save him or herself in situations where the state is unable to intervene."  Note, *A defensible defense?: Reexamining castle doctrine statutes*, 47 Harv J on Legis 523, 549 (2010).  Although the use of force to protect life and property is primarily the duty of the state, the state does not possess a monopoly in this regard.  US Const, Am II; see also *District of Columbia v Heller*, 554 US 570, 628; 128 S Ct 2783; 171 L Ed 2d 637 (2008) (stating that "the inherent right of self-defense has been central to the Second Amendment right," and "the need for defense of self, family, and property is most acute" in the home); *McDonald v City of Chicago*, 561 US ___, ___; 130 S Ct 3020, 3044; 177 L Ed 2d 894 (2010) ("[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home.").  When the state fails to fulfill its responsibilities, people are more

13

likely to be confronted with the need to exercise their right of self-defense, and difficult factual issues and complex legal issues are likely to arise. Any lack of clarity concerning the boundaries within which this right begins and ends will inevitably "entrap or mislead those [citizens] whose misfortunes compel a resort to them." *Pond*, 8 Mich at 173.

In sum, the law of self-defense and retreat is clear, and a correct instruction should not have been difficult to craft on the facts presented. The following would have sufficed: "Defendant was on his porch when he was attacked. Thus, as a matter of law, he had no duty to retreat and you should not consider retreat in your consideration of whether his use of force was necessary." Instead, as is plainly seen in the instructions quoted previously, defendant's jury was repeatedly told that retreat could be a factor in its deliberations, and it was given inconsistent and confusing instructions about what constitutes the "home" in the law of self-defense.

### C. PLAIN ERROR

Because defense counsel did not object to the instructions given, defendant is entitled to relief only if he can establish that (1) there was error, (2) the error was plain, (3) defendant was prejudiced by the plain error, and (4) the plain error "resulted in the conviction of an actually innocent defendant" or the plain error ""seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" independent of the defendant's innocence.'" *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (citation omitted). The majority acknowledges that "[a]n instruction that omitted the general duty to retreat and informed the jury only that defendant had no duty to retreat might have been clearer," *ante* at 5, but ultimately determines that the instructions given

14

were clear enough. I cannot agree. In my view, because the instructions given were contrary to MCL 768.21c(1), *Riddle*, and *Pond*, they were plainly erroneous.

The majority posits two arguments in an attempt to avoid this conclusion. First, the majority invokes the principle that jury instructions must be taken "as a whole," see *People v Kelly*, 423 Mich 261, 270-272; 378 NW2d 365 (1985), and argues that, because the instruction on the general duty to retreat was followed by the word "however," the jury was adequately informed that it should apply an exception to the general rule. With all respect, I am not persuaded. The majority has not even correctly formulated the proper instruction. The law of self-defense is not that there is some "general duty of retreat," albeit with certain exceptions, but that retreat is not even a relevant concept within one's dwelling or the curtilage of that dwelling, and therefore, under *Riddle*, retreat is not even permitted to be considered by the jury in that situation.[5] Therefore, it was not proper to introduce the broad duty of retreat as a relevant factor for the jury's

_____

[5] Faced with this Court's explicit, highly emphasized, and uniquely all-capitalized statement in *Riddle* that "RETREAT IS NOT A FACTOR IN ONE'S DWELLING" and this Court's additional statement that even "permitting the jury to consider a defendant's failure to retreat would be improper" in circumstances like those of the instant case, the majority now characterizes the latter as dictum. *Riddle*, 467 Mich at 134, 141 n 30. If anything, however, the fact that *Riddle* went out of its way to anticipate this very problem and to opine with rare forcefulness that such an instruction would be improper lends heightened significance to the latter statement in *Riddle*. Moreover, characterizing this statement as "dictum" as a basis for disregarding its guidance in the instant case can only interject uncertainty into the law of self-defense. The majority says it "wholeheartedly agree[s] . . . that the castle doctrine and the right of personal self-defense are longstanding and precious rights that we must vigorously uphold," *ante* at 6, but its disregard for the two opinions of this Court that gave the most practical expression to this doctrine and this right belie that assertion. Indeed, it is difficult to recall any case in the annals of this Court in which a more unequivocal statement concerning instructional error has been so thoroughly disregarded with so little explanation.

15

consideration and then negate that duty with several exceptions, only one of which could have applied on these facts. When, as here, defendant was indisputably within the zone in which an individual's obligations under the law of self-defense become transformed, the only proper instruction would have affirmatively *prohibited* the jury from considering retreat because defendant was on his porch and thus had no duty to retreat as a matter of law. *That* was the instruction that the law required on the facts of this case, and the majority is unable to identify where the instructions, "taken as a whole" or otherwise, communicated this fundamental principle to the jury.

Second, the majority excuses the instructions because they "tracked CJI2d 7.16 almost verbatim." *Ante* at 5. However, far from insulating the error in this case, the trial court's reliance on the standard jury instruction is indicative of the problem with the standard jury instruction. There is no rule requiring that standard jury instructions be read, much less be read in full, when portions of those instructions are inapplicable to the facts of the case. As we stated in *People v Petrella*, 424 Mich 221, 277; 380 NW2d 11 (1985):

> [W]e remind the bench and bar once again that the Michigan Criminal Jury Instructions do not have the official sanction of this Court. Their use is not required, and trial judges are encouraged to examine them carefully before using them, in order to ensure their accuracy and appropriateness to the case at hand.

The trial court in this case did not "ensure [the instructions'] accuracy and appropriateness to the case at hand." *Id*. The majority may not want to "require trial courts to sua sponte depart from the criminal jury instructions under circumstances such as those presented here," *ante* at 5, but that is exactly what the law requires trial courts to

16

do, and I am confident that Michigan trial judges are fully capable of tailoring standard jury instructions to the specific facts before them. Indeed, this is their responsibility and obligation. *People v Lambert*, 395 Mich 296, 304; 235 NW2d 338 (1975) ("It is the function of the court to inform the jury of the law by which its verdict must be controlled. The purpose of instructions is to enable the jury to understand and apply the law to the facts of the case.").

In this case, the court was required to make CJI2d 7.16 appropriate to the undisputed facts by eliminating all language from the instruction indicating that defendant may have had some duty to retreat. In addition, the court should have told the jury, using the appropriate language, that defendant did not have a duty to retreat because he was on his "porch" and in his "home." Instead, the instructions informed the jury of the general duty to retreat, then set forth the several exceptions, only one of which was applicable on these facts, and finally cluttered the jurors' minds with irrelevant legal terms like "abode" and "appurtenant structure."

Having determined, in my judgment, that plain error occurred, I next consider whether the error resulted in outcome-determinative prejudice.[6] In determining whether

---

[6] In summarizing the "abundant evidence from which the jury could and did conclude that defendant's use of deadly force was not necessary," the majority incorrectly suggests that there is some question in this case about the sufficiency of the evidence. *Ante* at 6 n 9. To be clear, there is not. The only question is whether the instructional error that permitted the jury to consider retreat prejudiced defendant.

Nonetheless, I do question the accuracy and relevancy of the majority's summarization of the evidence. Specifically, it is unclear to me why it matters that "neither Dinwiddie nor Abrams was carrying a firearm or knife," *ante* at 6 n 9, when it is undisputed that they came to defendant's home wielding a baseball bat. I am also confused about why the majority repeatedly notes that "defendant was *unharmed*" in the

17

such prejudice occurred, we review the entire record, including both the jury instructions and the evidence. *Carines*, 460 Mich at 772 n 18. That review makes it apparent that defendant's assertion of innocence rested *solely* on his claim of self-defense. This was *the* exclusive and determinative issue at trial, and by all indications it was not an easy issue for the jury. By instructing the jury that retreat could be a relevant factor in its deliberations, the court went far in foreclosing the jury's consideration of defendant's self-defense argument because the evidence clearly indicated that defendant *could have* retreated further. He was on his porch, and he could have retreated into his house, just as his wife did. And, significantly, we need not speculate about whether the jury considered retreat as a factor in its deliberations because it *expressly* indicated that it did so in its note asking:

> What is consider[ed] the defendants "home"? to understand <u>Self defense</u>?

> Need clarification—Can the Judge instruct us?

There was simply no other reason for the jury to inquire into the meaning of "home" in the law of self-defense if it was not struggling with the question whether defendant did or

---

incident at his home. *Ante* at 6 n 9, 7 (emphasis added). If the majority means that defendant was not physically harmed, the law of self-defense does not require physical injury before a person may exercise his or her right of self-defense, and this fact is immaterial to the application of the castle doctrine. Finally, in light of the undisputed fact that Dinwiddie and Abrams were under the influence of drugs and alcohol when they confronted defendant with fighting words and a baseball bat at his home, as well as the historical context underlying this confrontation, the majority's summation that "defendant emptied his gun into two defenseless and retreating victims" seems more than a little bit overstated. *Ante* at 6 n 9.

did not have a duty to retreat.[7]  The jury should never have been permitted to consider this irrelevant and highly prejudicial question.  *Riddle*, 467 Mich at 141 n 30.  Thus, the failure to give a clear and straightforward instruction that defendant had no duty to retreat as a matter of law may have been the "equivalent to an instruction to the jury that the defendant had failed to justify the [assault] on the ground of self-defense."  *People v Tomlins*, 213 NY 240, 245; 107 NE 496 (1914).  As then Judge Cardozo reasoned in

---

[7] Thus, contrary to the majority's assertion, there is, in fact, something "in the record" to support the conclusion that "the jurors rejected defendant's self-defense claim in the belief that he should have retreated."  *Ante* at 7 n 13.  The jury note is proof that the jury was considering and struggling with the issue of retreat.  The majority states the obvious in observing that "[t]he note was sent *before* the judge clarified the meaning of 'home.'"  *Ante* at 8.  Of course the note was sent before the judge responded to it-- the note is what compelled the judge's response.  In any event, the judge's response in no way "clarified" the meaning of "home" for the jury.  The judge began his response by telling the jury to "put at rest just the home word right now."  He then referred to MCL 768.21c and set forth the castle doctrine under the statute.  He then defined "curtilage," explaining that "curtilage, as a general definition, mean[s] land or yard adjoining a house usually within an enclosure."  He never quite got around to answering the jury's question by defining "home," and his instructions in the end obscured, not clarified matters.  The jury should never have been told to "put at rest . . . the home word," because defendant was on his porch, which is, and which has always been, part of the "home" under the common law of self-defense.  See *Riddle*, 467 Mich at 138.  Accordingly, the references to MCL 768.21c, the restatement of the castle doctrine, and the redefinition of "curtilage" were irrelevant in responding to the jury's straightforward question.  In sum, the jury was asking for clarification about what comprised the "home" in the context of a case in which defendant was undisputedly on his porch.  On these facts, the proper response was simple: "The porch is considered the home in the law of self defense. Thus, defendant had no duty to retreat as a matter of law."  Still, the majority discounts the jury's note, which is objective evidence of what the jurors were actually thinking about in their deliberations because, in its view, "the success of defendant's self-defense claim did not hinge on whether he was required to retreat or stand his ground on his porch."  *Ante* at 7.  The majority may assert this, but its members were not in the jury room, where it is undisputed that jurors were considering and struggling with the issue of retreat without the benefit of accurate instructions.

*Tomlins*, the defense "was submitted in form, but not in substance, for the submission was coupled with instructions that predetermined the answer." *Id.* at 245-246.

Furthermore, review of the jury instructions as a whole, and of the entire trial record, strongly suggests that this error was not isolated, but reflects a serious misunderstanding of the law that permeated defendant's trial. The trial court's statements at sentencing were highly reflective of this misunderstanding. Speaking to defendant at sentencing, the court stated:

> The law says that one should retreat if they can. To me, by the facts of this case, you could have gone into your house, based on the facts as I heard them. Your wife was inside. You could have gone into the house also. And if something had maybe developed from that point where somebody might have tried to break into your house and do some thing [sic], maybe this might have been looked at differently.

The problem is that the law does *not* say "that one should retreat if they can" when one is in his or her dwelling or within the curtilage of dwelling, as defendant was. But the trial court presiding over defendant's trial instructed the jury as if it did, even after the court became aware of MCL 768.21c.

Finally, it is altogether possible that the plain error "resulted in the conviction of an actually innocent defendant." *Carines*, 460 Mich at 763. If defendant was indeed acting in self-defense, he is "actually innocent." See *Riddle,* 467 Mich at 127 ("[T]he killing of another person in self-defense is justifiable homicide . . . ."). At the very least, the plain error ""seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" independent of the defendant's innocence.'" *Carines*, 460 Mich at 763 (citation omitted). Defendant's jury was instructed that it could consider the fact that defendant "could have safely retreated but did not do so," when it unquestionably should

20

have been instructed that defendant had absolutely no duty or obligation to retreat. This erroneous instruction, in my judgment, most certainly "seriously affect[ed] the fairness" of defendant's trial. *Id.*

## IV. CONCLUSION

Despite explicit and crystal-clear pronouncements on the law of self-defense and retreat by our state's judicial and legislative branches, defendant's jury was never properly instructed that, on the undisputed facts of this case, he had no duty or obligation to retreat and, therefore, that it was not permitted to consider retreat as a factor in its deliberations. Instead, the jury was repeatedly instructed that retreat *could* be a factor in deciding whether defendant's use of force was necessary and the jury did, in fact, consider retreat. In my judgment, these instructional errors prejudiced defendant and were especially consequential as they implicated a quintessential right of a free society-- the right of personal self-defense. Therefore, I would reverse the judgment of the Court of Appeals and remand for a new trial-- a trial in which defendant's jury is plainly instructed that it cannot consider retreat because defendant had no duty to retreat.

Stephen J. Markman
Mary Beth Kelly

21